# 22-3097-cv

## United States Court of Appeals

*for the*

## Second Circuit

THOMAS SCHANSMAN, individually, as surviving parent of Quinn Lucas
Schansman, and as the as legal guardian on behalf of X.S., a minor.,
CATHARINA TEUNISSEN, individually and as the surviving parent and
personal representative of the Estate of QUINN LUCAS SCHANSMAN,
NERISSA SCHANSMAN, as surviving sibling of Quinn Lucas Schansman,
XANDER SCHANSMAN, individually, as a surviving Sibling of
Quinn Lucas Schansman,

*Plaintiffs-Appellees,*

– v. –

SBERBANK OF RUSSIA PJSC,

*Defendant-Appellant,*

WESTERN UNION COMPANY, WESTERN UNION FINANCIAL SERVICES,
INC., MONEYGRAM INTERNATIONAL, INC, MONEYGRAM PAYMENT
SYSTEMS, INC., VTB BANK PJSC,

*Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

NATALIE SHKOLNIK
JAY S. AUSLANDER
MICHAEL VAN RIPER
WILK AUSLANDER LLP
*Attorneys for Defendant-Appellant*
825 Eighth Avenue, Suite 2900
New York, New York 10019
(212) 981-2300

## CORPORATE DISCLOSURE STATEMENT

The undersigned counsel makes the following certification:

No other corporation or body owns 10% or more of the stock in Defendant Sberbank of Russia PJSC. As of April 30, 2020, the Russian Federation in the person of the Ministry of Finance of the Russian Federation owns a 50% equity stake plus one ordinary share in Defendant Sberbank of Russia PJSC.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION........................................................2

ISSUES PRESENTED............................................................................4

STATEMENT OF THE CASE ................................................................4

   A.     The Allegations and Claims Below .............................................5

   B.     Sberbank's Ownership by the Russian Federation .....................9

   C.     Procedural History Leading to the Decision on Appeal ..........10

   D.     The District Court's Decision ...................................................11

STANDARD OF REVIEW ...................................................................14

SUMMARY OF ARGUMENT .............................................................15

ARGUMENT .......................................................................................20

   I.     SBERBANK IS PRESUMPTIVELY IMMUNE FROM THIS
        LAWSUIT UNDER THE ANTI-TERRORISM ACT BECAUSE
        SBERBANK IS A "FOREIGN STATE" UNDER THE STATE
        OWNERSHIP CLAUSE OF THE FSIA.............................................20

       A.   The ATA Confers Presumptive Immunity on "Foreign
           State[s]."..................................................................................21

       B.   The ATA Necessarily Draws Its Definition of "Foreign
           State" from the FSIA ...........................................................21

          1.   "Foreign State" Means the Same Thing Under both the
              ATA and FSIA Because the Two Statutes Are Read In
              Pari Materia.................................................................23

          2.   "Foreign State" Means the Same Thing Under both the
               ATA and FSIA Because Courts Read the Same Term to
               Have the Same Meaning in the Same or Related Statutes........24

          3.   "Foreign State" Means the Same Thing Under both the
               ATA and FSIA Because Courts Interpret Statutes
               Affecting Immunity to Minimize Interference with
               Foreign Sovereigns ......................................................26

       C.   The State Ownership Clause Immunized Sberbank Under
           the ATA and FSIA Both At the Time of Filing And Upon

i

Its Post-Filing Acquisition by the Ministry of Finance of the Russian Federation ........................................................................27

D.  Even If A "Foreign State" Under The ATA Did Not Include State-Owned Enterprises, Sberbank Would Still Be Presumptively Immune as an "Agency" Of The Russian Federation ........................................................................29

II.  THE ATA PROVIDES ONLY ONE EXCEPTION TO ITS SEPARATE GRANT OF SOVEREIGN IMMUNITY: CLAIMS FOR INJURIES CAUSED BY TERROR ATTACKS WITHIN THE UNITED STATES ..................................................................31

A.  The District Court Wrongly Concluded Without Analysis that the ATA and FSIA Are in All Respects "Functionally Equivalent" ........................................................................31

B.  The Only Provision that Abrogates ATA Sovereign Immunity is the JASTA Exception ..................................................32

1.  The Text of the Commercial Activity Exception Does Not Support the Interpretation that it Abrogates Sovereign Immunity Under the ATA .............................................34

2.  When Congress Passed the ATA, It Did Not Expressly or Impliedly Make the ATA's Grant of Sovereign Immunity Subject to the Commercial Activity Exception .....................35

3.  No Subsequent Amendment to the FSIA or ATA Prior to JASTA Abrogated the ATA's Immunity Provision ...............37

4.  Before JASTA, No Court Ever Held that Parties Could Bring Claims Against Foreign States Under the ATA ............38

5.  In 2016 JASTA Created the Lone ATA Immunity Exception for Terror Attacks Within the United States, But JASTA Did Not Incorporate the Commercial Activity Exception ........................................................40

III. MAINTAINING THE SEPARATION BETWEEN ATA SOVEREIGN IMMUNITY AND THE COMMERCIAL ACTIVITY EXCEPTION BEST COMPORTS WITH THE NATURE, PURPOSES, AND CONGRESIONALLY PRESCRIBED LIMITATIONS OF THE ATA AND FSIA.................42

A.   Foreign Sovereign Immunity Exists to Protect the United States in Its Dealings Abroad, Avoid Friction in International Relations, and Harmonize International Law ...............................42

B.   The ATA Is Ultimately a Criminal Statute, Not a Commercial Regulation, And Its Extraterritorial Reach Would Dramatically Increase Friction in International Relations If Unchecked by Sovereign Immunity ......................................................................43

C.   With JASTA, Congress and the President Recognized the Dramatic Potential Harms Arising From a Repeal of Sovereign Immunity Under the ATA.............................................46

D.   Congress Declared in JASTA Itself That JASTA's Limitation to Claims for Injuries in the United States Is a Necessary Component of the Broadest Possible Relief Against Foreign States ...............................................................................48

IV.   EVEN ASSUMING FOR THE SAKE OF ARGUMENT THAT THE COMMERCIAL ACTIVITY EXCEPTION CAN APPLY TO CLAIMS UNDER THE ATA, THAT EXCEPTION CANNOT APPLY HERE......................................................................49

A.   The FSIA's Burden-Shifting Framework for Determining Sovereign Immunity....................................................................50

B.   The Three Prongs of the Commercial Activity Exception ...........50

C.   To Determine Whether a Claim is "Based Upon" Commercial Activity, the Courts Must First Identify the Core of the Suit—the Conduct that Actually Injured the Plaintiff....................................51

D.   The Core of Plaintiffs' Claims is the Attack On MH-17, Which Is Not  Commercial Activity ............................................53

E.   None of Sberbank's Alleged Activity Fits Within Any of the Three Prongs of the Commercial Activity Exception..............54

     1.   Sberbank's Maintenance of Correspondent Banking Accounts in the United States Does Not Satisfy the First Prong of the Commercial Activity Exception...........................54

     2.   Plaintiffs Allege No "Acts" in the United States by Sberbank Within the Meaning of the Second Prong of the Commercial Activity Exception ...................................................56

3. Plaintiffs Allege No "Direct Effect" in the United States and Therefore Cannot Invoke the Third Prong of the Commercial Activity Exception .................................................57

CONCLUSION ...........................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arch Trading Corp. v. Republic of Ecuador*,
  839 F.3d 193 (2d Cir. 2016) ...................................................................11

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989) ...............................................................................21

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
  813 F.3d 98 (2d Cir. 2016) ....................................................................58

*Azar v. Allina Health Servs.*,
  139 S. Ct. 1804 (2019) ..........................................................................26

*Biton v. Palestinian Interim Self-Gov't Auth.*,
  412 F. Supp. 2d 1 (D.D.C. 2005) ..........................................................44

*Blue Ridge Invs., L.L.C. v. Republic of Argentina*,
  735 F.3d 72 (2d Cir. 2013) ......................................................................3

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
  581 U.S. 170 .......................................................................... 43, 45, 47

*Broidy Cap. Mgmt. LLC v. Muzin*,
  No. 22-7082, 2023 WL 2439809 (D.C. Cir. Mar. 10, 2023) ..............42

*Carpenter v. Republic of Chile*,
  610 F.3d 776 (2d Cir. 2010) ..................................................................15

*Cicippio-Puleo v. Islamic Republic of Iran*,
  353 F.3d 1024 (D.C. Cir. 2004).............................................................37

*Cohen v. Beneficial Indus. Loan Corp.*,
  337 U.S. 541 (1949) .................................................................................2

*Daou v. BLC Bank, S.A.L.*,
  42 F.4th 120 (2d Cir. 2022) ........................................................... 57, 58

*Doe v. Bin Laden*,
    663 F.3d 64 (2d Cir. 2011) ...................................................................39

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003) ............................................................. 12, 23, 28

*Dorsey v. United States*,
    567 U.S. 260, 132 S.Ct. 2321, 183 L.Ed.2d 250 (2012) ....................36

*Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*,
    12 F.3d 317 (2d Cir. 1993) ........................................................... 10, 15

*EM Ltd. v. Banco Central de la República Argentina*,
    800 F.3d 78 (2d Cir. 2015) .....................................................................3

*EM Ltd. v. Republic of Argentina*,
    473 F.3d 463 (2d Cir. 2007) .................................................................11

*Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    984 F.3d 30 (2d Cir. 2020) ...................................................................36

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) ........................................................................ 26, 31

*Fed. Republic of Germany v. Philipp*,
    141 S. Ct. 703 (2021) ...........................................................................43

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
    554 U.S. 33 (2008) ...............................................................................35

*Freeman v. HSBC Holdings PLC*,
    57 F.4th 66 (2d Cir. 2023) ....................................................................48

*Funk v. Belneftekhim*,
    861 F.3d 354 (2d Cir. 2017) ...................................................................3

*Garb v. Republic of Poland*,
    440 F.3d 579 (2d Cir. 2006) .................................................................12

*Guirlando v. T.C. Ziraat Bankasi A.S.*,
    602 F.3d 69 (2d Cir. 2010) ...................................................................58

*IBP, Inc. v. Alvarez,*
546 U.S. 21 (2005) ........................................................................ 25, 30

*In re Terrorist Attacks on Sept. 11,*
*2001*, 298 F. Supp. 3d 631 (S.D.N.Y. 2018) ...................................... 41

*Jama v. Immigr. & Customs,*
*Enf't*, 543 U.S. 335 (2005) ............................................................... 41

*Kensington Int'l Ltd. v. Itoua,*
505 F.3d 147 (2d Cir. 2007) ........................................................ 53, 56

*Kiobel v. Royal Dutch Petroleum Co.,*
569 U.S. 108 (2013) .......................................................................... 49

*Knox v. Palestine Liberation Org.,*
306 F. Supp. 2d 424 (S.D.N.Y. 2004) ............................................... 23

*Lawton v. Republic of Iraq,*
581 F. Supp. 2d 43 (D.D.C. 2008) .................................................... 39

*Linde v. Arab Bank, PLC,*
882 F.3d 314 (2d Cir. 2018) ............................................................... 6

*Mohawk Indus., Inc. v. Carpenter,*
558 U.S. 100 (2009) ............................................................................ 2

*Nat'l City Bank of New York v. Republic of China,*
348 U.S. 356 (1955) .......................................................................... 42

*OBB Personenverkehr AG v. Sachs,*
577 U.S. 27 (2015) ....................................................... 8, 13, 51, 52

*Opati v. Republic of Sudan,*
140 S. Ct. 1601 (2020) ...................................................................... 42

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
566 U.S. 639 (2012) .......................................................................... 36

*Republic of Austria v. Altmann,*
541 U.S. 677 (2004) ..................................................................... 28, 42

*Republic of Iraq v. Beaty*,
   556 U.S. 848 (2009) .......................................................................28

*RJR Nabisco, Inc. v. Eur. Cmty.*,
   579 U.S. 325 (2016) .......................................................................43

*Rockwell Int'l Corp. v. United States*,
   549 U.S. 457 (2007) .......................................................................28

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013) ............................................................56

S.2040, 2016 WL 5334803 ..............................................................46

*Sachs v. Republic of Austria*,
   737 F.3d 584 (9th Cir. 2013) .................................................. 51, 52

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993) ............................................................... 20, 52

*Smith ex rel. Smith v. Islamic Emirate of Afghanistan*,
   262 F. Supp. 2d 217 (S.D.N.Y. 2003) ..........................................39

*Smith v. Socialist People's Libyan Arab Jamahiriya*,
   101 F.3d 239 (2d Cir. 1996) ..........................................................38

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*,
   482 U.S. 522 (1987) .......................................................................42

*Sokolow v. Palestine Liberation Organization*,
   583 F.Supp.2d 451 (S.D.N.Y. 2008) .............................................32

*Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*,
   204 F.3d 384 (2d Cir. 2000) .................................................... 52, 53

*Ungar v. Palestinian Liberation Org.*,
   402 F.3d 274 (1st Cir. 2005) ................................................ passim

*United States v. Turkiye Halk Bankasi A.S.*,
   16 F.4th 336 (2d Cir. 2021) ................................................ 3, 14, 44

*Veneruso v. Mount Vernon Neighborhood Health Ctr.*,
   933 F. Supp. 2d 613 (S.D.N.Y. 2013) ...........................................30

viii

*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983) ...................................................................43

*Virtual Countries, Inc. v. Republic of S. Afr.*,
  300 F.3d 230 (2d Cir. 2002) ......................................................... 50, 57

*Weltover*,
  504 U.S. at 618 .........................................................................57

*Zuza v. Off. of the High Representative*,
  857 F.3d 935 (D.C. Cir. 2017)....................................................28

**Statutes**

18 U.S.C. § 6........................................................................... 29, 30

18 U.S.C. § 2331 ...................................................................... 44, 45

18 U.S.C. § 2333 ...................................................................... passim

18 U.S.C. § 2337 ...................................................................... passim

18 U.S.C. §§ 2339A and 2339C ...............................................44

28 U.S.C. § 1291 ......................................................................2, 3

28 U.S.C. § 1330 ...................................................................... 22, 59

28 U.S.C. § 1604 ...................................................................... 3, 22, 31

28 U.S.C. § 1605 ...................................................................... passim

28 U.S.C. § 1605A ................................................................... 22, 38

28 U.S.C. § 1605B ................................................................... passim

28 U.S.C. §§ 1603, 1604 .......................................................... passim

PL 94–583, 90 Stat 2891..........................................................34

PL 94–583, § 1605(a)(2)...........................................................34

Pub. L. 102-572........................................................................ 24, 35

Pub. L. 103-429, § 2(1), 108 Stat. 4377 (1994).......................24

Pub. L. 104-132 ................................................................................37

Pub. L. 110-181 ................................................................................38

Pub. L. 114-222, 130 Stat 852 ................................................. 14, 24, 48

**Rules**

Rule 12(b)(1) of the Federal Rules of Civil Procedure .............................................2

**Other Authorities**

*O'Neill v. Al Rajhi Bank*,
  2014 WL 2202862 (U.S.) ............................................................. 45, 47

Restatement of Conflict of Laws § 377 (1934) .......................................................58

S. Rep. No. 102-342 ......................................................................... 37, 46

## INTRODUCTION

The Anti-Terrorism Act ("ATA") and Foreign Sovereign Immunities Act ("FSIA") both immunize state-owned bank Sberbank of Russia PJSC ("Sberbank") against the claims in this action.  The district court should therefore have granted Sberbank's motion to dismiss under the ATA and FSIA because it lacked both original subject-matter jurisdiction over the action and personal jurisdiction over Sberbank.  Instead, the district court erroneously denied that motion because—in its view—the commercial activity exception *to the FSIA* abrogated Sberbank's immunity under *both* statutes.

Sberbank appeals from that order as of right under the collateral order doctrine.

The district court principally erred because sovereign immunity under the ATA does not yield to the commercial activity exception of the FSIA, not even in principle.  Rather, the ATA admits of only one exception: acts of international terror within the United States that cause injury within the United States.  Here, Plaintiff-Appellees bring two claims—both solely under the ATA—for injuries inflicted by non-parties in a heinous attack on a civilian airliner over Ukraine.  The ATA's lone exception to immunity, therefore, does not apply.

The district court also erred because—having mistakenly concluded that the FSIA's commercial activity exception is also an exception to sovereign immunity

under the ATA—the court wrongly applied that exception. The FSIA's commercial activity exception applies only when the core conduct that *actually injured* the plaintiff fits within the exception. The district court erroneously concluded that the conduct that actually injured Plaintiff-Appellees was Sberbank's maintenance of correspondent banking accounts in the United States and provision of banking services overseas. But the conduct that *actually injured* Plaintiff-Appellees was the attack on the airliner itself, which plainly was not commercial activity.

Because ATA immunity is not subject to the commercial activity exception of the FSIA and because—even if it was—the commercial activity exception would not pierce Sberbank's sovereign immunity, this Court should reverse and remand with instructions to dismiss the case as against Sberbank with prejudice.

## STATEMENT OF JURISDICTION

This is an appeal as of right under 28 U.S.C. § 1291 pursuant to the collateral order doctrine, which is a "practical rather than a technical construction" of Section 1291 that permits appeal from "a small class of collateral rulings that, although they do not end the litigation, are appropriately deemed final." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545-46 (1949) (internal quotation marks omitted)).

Sberbank takes this appeal from a decision of the district court (Carter, J.) erroneously denying its motion to dismiss under Rule 12(b)(1) of the Federal Rules

2

of Civil Procedure on the grounds that it is immune from suit in this action under the Anti-Terrorism Act, 18 U.S.C. § 2337, and the Foreign Sovereign Immunities Act 28 U.S.C. § 1604.  SPA-12.[1]  This Court has repeatedly and "consistently held that [a] threshold sovereign-immunity determination is immediately reviewable under the collateral-order doctrine."  *Funk v. Belneftekhim*, 861 F.3d 354, 363 (2d Cir. 2017) (quoting *EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78, 87-88 & n.36 (2d Cir. 2015) (alternation in original)); *see also United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 343 (2d Cir. 2021), *cert. granted*, 143 S. Ct. 82 (2022); *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 80-81 (2d Cir. 2013).

The district court erroneously denied Sberbank's motion to dismiss by order dated December 6, 2022.  (SPA 12).  Sberbank timely noticed this appeal the same day.  (A. 295).  Accordingly, this Court has jurisdiction over this appeal under 28 U.S.C. § 1291 and the collateral order doctrine.

---

[1] "SPA" refers to the Special Appendix for Defendant-Appellant appended to this brief; "A." refers to the Joint Appendix filed contemporaneously with this brief; "ECF" refers to an entry in the district court record not included in the Special Appendix for Defendant-Appellant or Joint Appendix.

3

**ISSUES PRESENTED**

1.  Whether the district court correctly determined that—as a state-owned enterprise—Sberbank is presumptively immune to suit under the ATA.

2.  Whether the district court erred in applying the general commercial activity exception of the FSIA to pierce Sberbank's separate immunity under the ATA, even though the only statutory provision that explicitly overrides sovereign immunity under the ATA applies only to claims for injuries sustained in the United States caused by an act of international terror in the United States.

3.  Whether—assuming *arguendo* that the commercial activity exception to the FSIA also abrogates the separate grant of sovereign immunity in the ATA— the district court erred in determining that the exception applied in this case even though the Court never determined that Sberbank's provision of banking services actually injured Plaintiff-Appellees, as that exception requires.

**STATEMENT OF THE CASE**

This action seeks to hold four defendants principally liable under the ATA for a terrorist atrocity committed by non-parties in Ukraine. One of those defendants, Sberbank, is a Russian state-owned enterprise. As such, Sberbank is a "foreign state" within the meaning of the ATA and is therefore immune from suit under the

ATA, save for one exception: claims seeking recovery for injuries sustained in an act of international terror in the United States.

Because Plaintiffs' underlying ATA claims seek recovery for injuries sustained in an attack in Ukraine, not the United States, Sberbank remains immune. The district court should therefore have granted Sberbank's motion to dismiss for lack of subject-matter and personal jurisdiction. Instead, the district court wrongly determined that the commercial activity exception to *the FSIA* also applied under *the ATA* and then misapplied that exception.

### A.    The Allegations and Claims Below

On July 17, 2014, a surface-to-air missile struck and destroyed a passenger airliner, Malaysian Airlines Flight 17 ("MH17") over eastern Ukraine, killing all aboard. (A. 68-69, ¶ 1). Plaintiff-Appellees are the Estate of Quinn Schansman ("Schansman")—who was killed in that disaster—and four of his immediate family members: father Thomas Schansman, mother Catharina Teunissen, sister Nerissa Schansman, and half-brother Xander Schansman (collectively, with Schansman, "Plaintiffs"). (A. 74-75, ¶¶ 28-31; ECF No. 281 at 1).

The Second Amended Complaint brings two claims against Sberbank and its co-defendants, both under the ATA's primary liability provision, 18 U.S.C. § 2333. (A. 167, ¶ 409; A. 169, ¶ 419). That provision permits an action by "[a]ny national of the United States injured in his or her person, property, or business by reason of

5

an act of international terrorism, or his or her estate, survivors, or heirs . . . ."  18 U.S.C. § 2333(a).  The ATA's sovereign immunity provision, however, forbids any such action against a "foreign state" or "an agency of a foreign state."  18 U.S.C. § 2337.

According to the operative Second Amended Complaint, a Ukrainian separatist group known as the Donetsk People's Republic ("DPR") attacked MH17 deliberately, as part of its campaign to create a new proto-state in the Donbas region of southeastern Ukraine.  (A. 68, ¶ 1; A. 69, ¶ 4; A. 89, ¶ 92; A. 91, ¶ 104).  Just weeks prior to that attack, in late June 2014, Russian media had reported that the DPR took "control over a missile defense army unit equipped with Buk missile defense systems."  (A. 86, ¶ 79).  On the day of the attack, moreover, DPR senior leadership posted a photograph of a sophisticated surface-to-air missile system mounted on a tracked military vehicle.  (A. 86, ¶ 78).  The Second Amended Complaint therefore alleges that the DPR shot down MH17.  (A. 87, ¶ 81).

Plaintiffs do not allege, however, that Sberbank transferred or provided funds to the DPR that it later used to purchase that Buk missile defense system.  Rather, as has become common in ATA cases,[2] they allege more remote causation: that Sberbank—along with a second Russian bank and two U.S.-based money transfer services, Western Union and MoneyGram—provided financial services to the

---

[2] *See, e.g., Linde v. Arab Bank, PLC*, 882 F.3d 314, 331 (2d Cir. 2018).

DPR's supporters.  (A. 81-82, ¶¶ 63-65; A. 160, ¶¶ 378-79).  Using those services, the DPR's fundraisers and leadership allegedly solicited and received donations from other non-parties.  (A. 102, ¶ 150).

The DPR and its alleged supporters then used those donations to purchase weapons, ammunition, and tactical equipment.  (A. 109, ¶ 181).  Like the Buk missile itself, much of this material consisted of sophisticated military equipment, including collimator reflex sights, (A. 112, ¶ 193), sniper rifles and small arms, (A. 123-24, ¶¶ 233-235), sniper rifle scopes, camouflage skins, body armor, night vision devices, a specialized long-range machine gun sight, (A. 122, ¶ 231), UAVs (unmanned aerial vehicles) for aerial reconnaissance, thermal imaging sights, and radios.  (A. 114-15, ¶¶ 202-203).  Having acquired this material, the DPR was then able to plan and carry out "lethal" and "tactical" activities and acquire the territory from which it attacked MH17.  (A. 104-05, ¶¶ 160-61).

Although the Second Amended Complaint does not directly link these purchases to funds transferred through Sberbank, it purports to document transfers to Sberbank accounts maintained by DPR-affiliated organizations in Russia and Ukraine, and alleges generally that the DPR used those funds to support its activities. (A. 115-17, ¶¶ 204-05 and 210).

The Second Amended Complaint, however, alleges almost no specific transfers to the DPR and its supporters using Sberbank accounts *in the United*

7

*States*—a crucial element of the FSIA's commercial activity exception. Rather, the Second Amended Complaint generally alleges that DPR supporters routed dollar transactions to the DPR using Sberbank's correspondent banking accounts in New York and that the DPR "provided instructions" on how to transfer dollars using those correspondent accounts. (A. 80, ¶ 58; A. 107, ¶ 172).

Yet the only *evidence* Plaintiff has ever identified to establish transfers through Sberbank's correspondent accounts in New York—and it is indeed *evidence* that counts under the commercial activity exception—purports to show two transfers from donors in Maryland and New Jersey to the DPR's self-professed foreign minister totaling $300.00. (A. 112, ¶ 191; A. 64). Although, in a single footnote to their briefing below, Plaintiffs *alluded* to the existence of additional evidence, they have—tellingly—*submitted* none of it. (ECF No. 312 at 20 n. 24).

Although the district court would later wrongly hold (in a decision not under appeal) that these two fleeting transfers sufficed to establish specific jurisdiction, (ECF No. 185 at 8-9), they cannot bring this suit within the FSIA's commercial activity exception because they are not the "core" conduct that "actually injured" the Plaintiffs. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015). Rather, as the Second Amended Complaint alleges, Schansman died "at the hands of terrorists." (A. 73, ¶ 22). He was "killed by the DPR." (A. 74, ¶ 28). That attack remains the core of this lawsuit; it is the source of Schansman's actual injury.

8

Even assuming, therefore, that the commercial activity exception applies to claims under the ATA—and it does not—Plaintiffs' claims do not fall within the exception.

### B.    Sberbank's Ownership by the Russian Federation

The ATA and FSIA both extend sovereign immunity to "foreign states," a statutory term of art that includes not just foreign states themselves, but also entities majority-owned by a "foreign state" or its "political subdivision[s]."  28 U.S.C. §§ 1603, 1604; 18 U.S.C. § 2337(2).  Although Sberbank's ownership changed during the pendency of this action, it has remained under the ownership of the Government of the Russian Federation or its political subdivisions—and therefore remained immune—throughout the proceedings.  (A. 66-67, 179, 183, 192).

Precisely, when Plaintiffs commenced this action on April 4, 2019, the Central Bank of the Russian Federation (the "Central Bank") owned a majority stake in Sberbank, 50% plus one share.  (A. 178).  Thereafter, on or about April 30, 2020, the Ministry of Finance of the Russian Federation acquired that majority stake.  (A. 179).

The Second Amended Complaint acknowledges that "the Government of the Russian Federation . . . owns [a majority stake] of [Sberbank]," thus alleging on its face Sberbank's presumptive immunity from suit. (A. 76, ¶ 37).  Nevertheless, Plaintiffs would later contend *outside* their pleadings that the Central Bank—

9

Sberbank's owner at the time of filing—is neither a "foreign state" or "political subdivision" of the Russian Government. (ECF No. 265 at 1-2). As such, according to Plaintiffs, their ATA claims can proceed because Sberbank lacked immunity at the time they commenced the action. (ECF No. 312 at 5).

### C.    Procedural History Leading to the Decision on Appeal

Plaintiffs filed the Second Amended Complaint on October 5, 2020. (A. 170). Sberbank then brought the first of two motions to dismiss that complaint on November 2, 2020, for failure to state a claim and lack of personal "long-arm" jurisdiction. (A. 171-72). After the district court denied that motion on September 30, 2021, (ECF No. 185), Sberbank duly filed its answer on November 11, 2021. (A. 173).

Although Plaintiffs would later argue that Sberbank waived its immunity defense (or at least waived the right to have it determined early in the case), the very first paragraph of Sberbank's answer asserted sovereign immunity, (A. 174), consistent with this Court's holding that "the filing of a responsive pleading is the *last chance* to assert FSIA immunity if the defense has not been previously asserted." *Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*, 12 F.3d 317, 326 (2d Cir. 1993) (emphasis in original). Sberbank therefore did not waive the defense.

10

Sberbank then brought its second motion to dismiss the Second Amended Complaint on December 30, 2021, for lack of subject-matter jurisdiction. (A. 176-77). On Plaintiffs' application, the district court then authorized "surgical" jurisdictional discovery, (A. 204), in order to—as this Court has put it—"verify allegations of specific facts crucial to an immunity determination." *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 207 (2d Cir. 2016) (quoting *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007)). Jurisdictional discovery initially ceased on April 11, 2022 with the submission of a joint status report, (A. 208), then briefly resumed at the district court's direction on October 20, 2022. (A. 209).

The district court then issued its ruling denying Sberbank's second motion to dismiss on December 6, 2022, holding that Sberbank was presumptively immune but that the FSIA's commercial activity exception pierced that immunity. (SPA 1-12). This appeal followed the same day. (A. 295).

### D. The District Court's Decision

Although the district court correctly ruled that Sberbank is a "foreign state" that may invoke sovereign immunity, the court ultimately erred by conflating the distinct exceptions to sovereign immunity under the ATA and FSIA. (SPA 8, 11-12).

11

First, however, the district court declined to rule on Plaintiffs' argument that Sberbank waived its sovereign immunity defense. (SPA 2).

Second, the district court then correctly ruled that Sberbank is presumptively immune under the FSIA. (SPA 8). The district court, however, reached one *incorrect* conclusion along the way—one that, when corrected, moots Plaintiffs' argument below that Sberbank lacked immunity at the time of filing. Adopting Plaintiffs' view of *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), the district court incorrectly determined that courts may only assess whether a defendant is a "foreign state" under the FSIA at the time of filing and must ignore any subsequent developments that confer immunity, even though *Dole* does not so hold. (SPA 4-5). Accordingly, the district court took no account of Sberbank's acquisition by the Ministry of Finance in April 2020, (SPA 5), and instead mistakenly focused only on whether the Central Bank's ownership of Sberbank at the time of filing vested Sberbank with presumptive immunity. (SPA 5-8).

The district court nevertheless correctly answered that question in the affirmative, applying this Court's well-established "core functions test" to conclude that Sberbank's previous owner, the Central Bank, is a "political subdivision" of the Russian Government—and thus that the Russian Federation directly owned Sberbank. (SPA 6-7); *see generally Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006). As such, Sberbank was: (i) an "agency or instrumentality" of the Russian

12

state at the time of filing; and (ii) accordingly, a presumptively immune "foreign state" within the meaning of the FSIA. (SPA 8); 28 U.S.C. § 1603(b)(2).

Third, the district court incorrectly ruled that the FSIA's "commercial activity exception applies to this case," (SPA 8), because Sberbank's alleged provision of financial services is commercial. (SPA 10). In so ruling, the district court overlooked the Supreme Court's recent holding in *Sachs*, 577 U.S. at 396, which holds that courts must "zero[] in" on "the core of [plaintiff's] suit: the [acts] that actually injured [plaintiffs]," and permit the suit to proceed only if that core conduct fits within the commercial activity exception. That conduct is the DPR's attack on MH17, which does *not* fit within the exception. (SPA 73, ¶ 22).

Fourth, the district court misconstrued the ATA, taking the well-worn observation that an assertion of presumptive immunity under the ATA and FSIA are "functionally equivalent" to mean that ATA and FSIA immunity is identical in all respects. (SPA 11) (quoting *Ungar v. Palestinian Liberation Org.*, 402 F.3d 274, 283 (1st Cir. 2005)). The district court then summarily concluded that "Sberbank's argument to read the ATA's sovereign immunity provision more broadly than the FSIA are thus counter to the practice of the federal courts." (SPA 12).

But Sberbank's argument—then and now—is that, although the ATA and FSIA ought to be read harmoniously, Congress has ultimately enacted only *one* exception to the ATA's separate grant of sovereign immunity: 28 U.S.C. § 1605B

13

("the JASTA exception").[3]  (ECF No. 258 at 18-19).  That exception explicitly and unequivocally lifts sovereign immunity "[n]otwithstanding section 2337(2) of title 18"—that is, notwithstanding the ATA's sovereign immunity provision—but *only* for claims seeking recovery for "physical injury to person or property or death occurring in the United States" caused by "act of international terrorism in the United States."  28 U.S.C. § 1605B.  In contrast, Congress has never explicitly or implicitly stated that ATA immunity yields to the commercial activity exception, not in the commercial activity exception itself, not in the ATA itself, and not in the FSIA itself.  The FSIA's commercial activity exception does not defeat the ATA's separate grant of sovereign immunity.

The district court did not address this argument or analyze the two different sets of exceptions to the ATA and FSIA.  The court erred when it held that the commercial activity exception abrogated Sberbank's presumptive immunity under both statutes.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's legal determinations regarding its subject matter jurisdiction, [including] whether sovereign immunity exists, and its factual determinations for clear error."  *Turkiye Halk Bankasi*, 16 F.4th at 345

---

[3] So-called because Congress passed this new exception as part of the 2016 Justice Against Sponsors of Terrorism Act ("JASTA").  Pub. L. 114-222, 130 Stat 852.

(internal quotations and citations omitted); *see also Carpenter v. Republic of Chile*, 610 F.3d 776, 778 (2d Cir. 2010) ("We review the District Court's legal conclusions under FSIA *de novo*.").  Where "the issues presented for consideration on this appeal involve the application of the FSIA to essentially undisputed facts, [this Court] review[s] *de novo*."  *Drexel Burnham*, 12 F.3d at 324.

## SUMMARY OF ARGUMENT

Sberbank is immune from both of Plaintiffs' claims in this matter under the sovereign immunity provision of the ATA.  That provision admits only one exception: claims for injuries occurring in in the United States caused by an act of international terror in the United States.  Because Plaintiffs bring claims for injuries occurring in Ukraine caused by an act of terror in Ukraine, the district court should have dismissed the case as against Sberbank.  Instead, the district court erroneously determined that the commercial activity exception of the FSIA also applies under the ATA and then mistakenly concluded that Plaintiffs' claims fall within that exception.

### *Sberbank is Presumptively Immune Under the ATA*

The ATA immunizes "foreign state[s]" and "agenc[ies] of a foreign state." Although the ATA does not define the term "foreign state," it necessarily draws the meaning of that term from the FSIA.  That is so because: (i) both provisions deal with the same subject matter, sovereign immunity from suit, and should therefore be

15

read *in pari materia*; (ii) under well-established law, courts ordinarily apply the same meaning to the same term in the same or related statutes, and here the ATA and FSIA are inextricably linked textually and structurally; (iii) courts must also interpret immunity statutes in a manner that protects the interests of foreign sovereigns and minimizes international friction, compelling the conclusion that "foreign state" carries the same meaning under both statutes.

Sberbank is therefore a presumptively immune "foreign state" under the ATA because: (i) at the time of filing in April 2019, the Central Bank owned a majority stake in Sberbank; and (ii) in April 2020, the Ministry of Finance acquired a majority stake in Sberbank, conferring immunity on Sberbank regardless of whether Sberbank was a "foreign state" under the Central Bank's ownership.

Even if the ATA, moreover, did not draw the meaning of "foreign state" from the FSIA, Sberbank would still be presumptively immune under the ATA as an "agency of a foreign state" within the meaning of Title 18.

### The ATA Provides Only One Exception to Its Separate Grant of Sovereign Immunity and that Exception Does Not Apply in this Case

The district court erroneously determined that the commercial activity exception under the FSIA applies under the ATA, even though only one provision pierces sovereign immunity under the ATA: the JASTA exception. The district court reached that erroneous conclusion by assuming, with little analysis, that immunity under the FSIA and ATA are in all respects equivalent, even though the

16

ATA had *no exceptions* from its enactment in 1992 through the enactment of the JASTA exception in 2016.

When Congress passed the ATA in 1992, it included no exceptions to its specific grant of immunity provision. Under the canon of construction requiring that later-enacted *specific* statutory provisions control over earlier-enacted *general* provisions, there is no basis to conclude that Congress in 1992 intended the commercial activity exception to apply to the ATA's newly enacted immunity provision: indeed, Congress flatly stated otherwise in the contemporaneous legislative history.

Thereafter, even as Congress repeatedly amended the FSIA to address claims against foreign states arising from terror attacks, it never included any language abrogating immunity under the ATA. Only in 2016 did Congress specifically and directly abrogate ATA immunity in the JASTA exception, and that exception does not incorporate or even reference the commercial activity exception. There is not now and never has been any textual or structural support for applying the commercial activity exception to claims under the ATA.

### *Maintaining the Separation Between the Commercial Activity Exception and ATA Sovereign Immunity Best Comports With the Nature, Purposes, and Congressional Limitations in the ATA and FSIA*

Foreign sovereign immunity is a doctrine of both comity and reciprocity. To protect both the dignity of foreign sovereigns and the reciprocal interest of the United

17

States in avoiding the burdens of litigation in its own dealings abroad, the Supreme Court exhorts the courts to construe statutes affecting sovereign immunity to minimize international friction.

Although the FSIA establishes the general rule that foreign states shall remain immune from suit except in carefully defined commercial transactions, the ATA is not commercial regulation: it is a criminal statute with civil remedies. As such, a private claim under the ATA proceeds without the protections of criminal law and without authorization from the Executive Branch. Because, the ATA applies extraterritorially, moreover, its potential to cause friction in foreign relations when applied unchecked to foreign states is not only obvious on its face, but actually motivated Congress and the President in the debate over the JASTA exception. This is why the JASTA exception remains limited to domestic terror attacks. Indeed, Congress stated that the JASTA exception, including this domestic territorial limitation, represents the *broadest possible* remedy for such claims.

The commercial activity exception, however, does not include that territorial limitation. Therefore, permitting the commercial activity exception to pierce ATA immunity not only increases friction in international relations and risks embroiling the United States in burdensome litigation, it exceeds a limitation that Congress itself deemed essential in the carefully compromised JASTA exception.

18

### *Even if the Commercial Activity Exception Applied to Claims Under JASTA, It Would Not Apply in this Case*

The commercial activity exception applies only to claims "based upon" one or more of three prongs: (i) the foreign state's commercial activity in the United States; (ii) an "act" performed by the foreign state in the United States in connection with its commercial activity elsewhere; or (iii) commercial activity elsewhere that causes a "direct effect" in the United States.

To assess what acts or activity a claim is "based upon," the Supreme Court instructs that the court must "zero in" on the gravamen of the lawsuit: that is, the sovereign acts (if any) that "actually injured" the plaintiffs. This strict formulation imposes a standard of causation much greater than ordinary proximate cause. Here, the conduct that "actually injured" plaintiffs was the DPR's attack on MH17.

Even if it were not, moreover, none of the conduct Plaintiffs attribute to Sberbank could fit within any of the three prongs of the exception. Plaintiffs must produce evidence to establish an exception. The only evidence of Sberbank's commercial activity in the United States indicates that DPR supporters transferred $300 to the DPR through two Sberbank correspondent accounts in the United States. Yet Plaintiffs' theory is that the DPR's supporters used the funds they received through all four defendants' banking services to amass an arsenal in the Donbas and seize the territory from which the DPR attacked MH17. The transfer of $300 is not

19

remotely sufficient to support such activity; that is, these two transfers did not "[a]ctually injure" Plaintiffs.

The second prong applies to a foreign state's *non-commercial* "acts" in the United States: Plaintiffs have not alleged or evidenced any such non-commercial acts.

The third prong applies only when commercial activity overseas causes a "direct effect" in the United States, meaning an immediate effect with no intervening causes. An injury to a U.S. national outside the United States is not a direct effect in the United States. Plaintiffs, therefore, have neither alleged nor evidenced a "direct effect" in the United States.

## ARGUMENT

## I. SBERBANK IS PRESUMPTIVELY IMMUNE FROM THIS LAWSUIT UNDER THE ANTI-TERRORISM ACT BECAUSE SBERBANK IS A "FOREIGN STATE" UNDER THE STATE OWNERSHIP CLAUSE OF THE FSIA

No claim under the ATA may proceed against a "foreign state, [or] an agency of a foreign state" unless that claim seeks recovery for injuries "occurring in" the United States resulting from "an act of international terrorism in the United States." 18 U.S.C. § 2337(2); 28 U.S.C. § 1605B.

No claim of *any* kind, moreover, may proceed against a "foreign state" unless authorized under the FSIA, which "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Saudi Arabia v. Nelson*, 507 U.S.

349, 355 (1993) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989) (internal quotation marks omitted)).

Sberbank is a "foreign state" because the Russian Federation has owned a majority of its shares throughout the pendency of this action. (A. 178-80).

## A.    The ATA Confers Presumptive Immunity on "Foreign State[s]."

The ATA's sovereign immunity provision, 18 U.S.C. § 2337, extends immunity to the United States as well as any "foreign state" or "agency of a foreign state," forbidding any actions brought against them under the ATA's civil remedies provision:

> No action shall be maintained under section 2333 of this title [the ATA's civil remedies provision] against . . . (1) the United States . . . or (2) a foreign state, [or] an agency of a foreign state . . . .

Plaintiffs bring claims *only* under the ATA's civil remedies provision. (A. 165 ¶ 401; A. 167 ¶ 411). Any "foreign state" or "agency of a foreign state" is therefore presumptively immune to those claims.

## B.    The ATA Necessarily Draws Its Definition of "Foreign State" from the FSIA

Although the ATA immunizes "foreign state[s]," it does not separately define that term. The FSIA, in contrast, meticulously defines that term, reaching state-owned entities like Sberbank through a set of definitions and sub-definitions of "foreign state":

21

(a) A "*foreign state*" . . . includes . . . an *agency or instrumentality of a foreign state* as defined in subsection (b).

(b) An "*agency or instrumentality of a foreign state" means any entity*—

> (1) which is a separate legal person, corporate or otherwise, and (2) which is [i] an organ of a foreign state or political subdivision thereof, or [ii] *a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof* . . . .

28 U.S.C. § 1603. [4]

First, then, the FSIA defines "foreign state" to include an "agency or instrumentality" of a foreign state. 28 U.S.C. § 1603(a). Second, the FSIA defines an "agency or instrumentality" to include "a separate legal person, corporate or otherwise," so long as "a majority of [its] shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2) (the "State Ownership Clause").

---

[4] The basic structure of the FSIA is as follows: 28 U.S.C. § 1330 confers original subject-matter jurisdiction for claims against "foreign states," unless those foreign states are immune; 28 U.S.C. § 1603 defines "foreign state"; 28 U.S.C. § 1604 is the general grant of immunity to "foreign state[s]"; 28 U.S.C. § 1605 sets forth several exceptions to 28 U.S.C. § 1604, including the commercial activity exception; 28 U.S.C. § 1605A, the so-called "Flatow Amendment" or state-sponsored terrorism exception, establishes both an exception to immunity and a cause of action against designated state sponsors of terrorism; and 28 U.S.C. §1605B is the JASTA exception, the only one of these provisions to explicitly (though only partially) repeal the separate immunity provision of the ATA, 18 U.S.C. § 2337. (*See* SPA 13-25).

Through that syllogism—a foreign state includes its agencies or instrumentalities, and its agencies or instrumentalities includes corporations directly owned by the foreign state itself or its political subdivisions—the State Ownership Clause extends presumptive immunity to Sberbank. *See generally Dole Food*, 538 U.S. 468 at 473, 477.

Plaintiffs, however, have maintained that the term "foreign state" in the sovereign immunity provision of the ATA carries a different meaning than the term "foreign state" in the sovereign immunity provision of the FSIA. (ECF No. 312 at 21). They principally rest that argument on the absence of the word "instrumentality" from 18 U.S.C. § 2337, the ATA's immunity provision. (*Id*.) According to Plaintiffs, that missing phrase excludes state-owned enterprises from immunity under the ATA. (*Id*.)

1. *"Foreign State" Means the Same Thing Under both the ATA and FSIA Because the Two Statutes Are Read In Pari Materia*

The First Circuit has rejected Plaintiffs' reasoning, explaining that "the meaning of the term 'foreign state' as used in the FSIA and the ATA" should be read "*in pari materia*"—that is, coterminously, because both concern the same subject matter. *Ungar*, 402 F.3d at 282. Reading "foreign state" coterminously, Sberbank is presumptively immune under the ATA because it is presumptively immune under the State Ownership Clause. *Id*.; *see also Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424, 430 (S.D.N.Y. 2004) ("There is no indication that the term 'foreign

23

state' means something different in Title 18 of the United States Code than in Title 28.")

*Ungar's* conclusion is not merely a sensible application of *in pari materia* interpretation, however: it also necessarily follows from the deeply intertwined text and structure of the ATA and FSIA.

> 2. *"Foreign State" Means the Same Thing Under both the ATA and FSIA Because Courts Read the Same Term to Have the Same Meaning in the Same or Related Statutes*

Congress originally passed the ATA and Section 2337, its sovereign immunity provision, in 1992. Pub. L. 102-572, Title X, § 1003(a)(4), 106 Stat. 4522 (1992). For many years thereafter, Congress made minimal conforming amendments to the ATA, *see e.g.*, Pub. L. 103-429, § 2(1), 108 Stat. 4377 (1994), but has never made any amendment to the ATA's sovereign immunity provision itself. *See* 18 U.S.C. §§ 2333, 2337.

That status quo changed only in 2016 with the passage of JASTA. Pub. L. 114-222, 130 Stat 852 (2016). Among other reforms, Congress—for the first and only time—explicitly abrogated the blanket sovereign immunity of the ATA. 130 Stat. 852, 853.

To abrogate ATA sovereign immunity, however, JASTA did not amend the ATA itself. *Id*. Rather, it amended the FSIA, thus making fully explicit the

intertwined definition of "foreign state" that the First Circuit had perceived years earlier in *Ungar*. *Id*.

Codified at Section 1605B of the FSIA, the new JASTA exception provided the basis for suing a sovereign under the ATA using the very same term—"foreign state"—as does the rest of the FSIA itself and the ATA:

> [b] A foreign state shall not be immune . . . in any case in which money damages are sought against a *foreign state* for physical injury to person or property or death occurring in the United States and caused by—(1) an act of international terrorism in the United States; and
> (2) a tortious act or acts of the *foreign state* . . .
>
> ***
>
> [c] Notwithstanding section 2337(2) of title 18 [the ATA's sovereign immunity provision], a national of the United States may bring a claim against a *foreign state* in accordance with section 2333 of that title if the *foreign state* would not be immune under subsection (b).

28 U.S.C. 1605B (emphasis added).

JASTA, therefore, *must* use the same definition of "foreign state" as the rest of the FSIA, because "the normal rule of statutory interpretation [is that] identical words used in different parts of the same statute [here, the FSIA] are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005).

JASTA, moreover, also *must* use the same definition of "foreign state" as the ATA, because the JASTA exception expressly refers to and partially repeals the immunity of a "foreign state" under the ATA, and the Supreme Court "does not lightly assume that Congress silently attaches different meanings to the same term

in the same *or related* statutes." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019) (emphasis added).

These basic canons of interpretation thus establish that the term "foreign state" in the JASTA exception must have the same meaning as "foreign state" in both: (i) the rest of the FSIA (because the JASTA exception is a part of the FSIA); and (ii) the ATA's sovereign immunity provision (because the JASTA exception directly abrogates "foreign state" immunity under that provision). "Foreign state" must therefore have the same meaning across all three provisions: the FSIA, the JASTA exception, and the ATA.

3. *"Foreign State" Means the Same Thing Under both the ATA and FSIA Because Courts Interpret Statutes Affecting Immunity to Minimize Interference with Foreign Sovereigns*

This consistent interpretation of "foreign state" also conforms to the Supreme Court's admonition to construe statutes affecting sovereign immunity in a manner that "avoid[s] unreasonable interference with the sovereign authority of other nations." *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164-67 (2004). "This rule of statutory construction cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws. It thereby helps the potentially conflicting laws of different nations work together in harmony—a harmony particularly needed in today's highly interdependent commercial world." *Id.* at 164-65.

26

Under both the FSIA and ATA, then, a "foreign state" includes an entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof . . . ." 18 U.S.C. § 2337; 28 U.S.C. § 1603.

### C. The State Ownership Clause Immunized Sberbank Under the ATA and FSIA Both At the Time of Filing And Upon Its Post-Filing Acquisition by the Ministry of Finance of the Russian Federation

Sberbank is a "foreign state" under the ATA and FSIA because it is currently majority-owned by the Ministry of Finance and, before that, the Central Bank. 28 U.S.C. § 1603(b)(2). Sberbank has therefore been continuously immune from the time of filing of this lawsuit through present.

The district court agreed that Sberbank was immune at the time of filing because the Central Bank is a political subdivision of the Russian Federation. (SPA 8). Yet the district court nevertheless erred by adopting Plaintiffs' view of *Dole*, focusing *exclusively* on Sberbank's immunity at the time of filing and improperly ignoring Sberbank's later acquisition by the Ministry of Finance. (SPA 4-5).

Because the district court agreed that Sberbank was presumptively immune at the time of filing under the Central Bank's ownership, its erroneous reading of *Dole* was ultimately harmless error. Yet the district court's error still matters on appeal, because a proper reading of *Dole* and later precedents would have led the court to conclude that when the Ministry of Finance acquired Sberbank, Sberbank acquired immunity, thereby depriving the court of subject-matter jurisdiction. That

27

conclusion, in turn, moots any argument by Plaintiffs on appeal that this Court should affirm because Sberbank lacked immunity at the time of filing.

*Dole* did not fix immunity determinations at the time of filing. Rather, in *Dole*, the Supreme Court held only that—as between the "time an alleged tort or actionable wrong occurred" and the "'time suit is filed'"—the time of filing controls immunity. *Dole Food*, 538 U.S. at 471. Indeed, the Supreme Court made the limited scope of *Dole* clear almost immediately thereafter: "[*Dole*] held that whether an entity qualifies as an 'instrumentality' of a 'foreign state' for purposes of the FSIA's grant of immunity depends on the relationship between the entity and the state at the time suit is brought *rather than when the conduct occurred*." *Republic of Austria v. Altmann*, 541 U.S. 677, 698 (2004) (emphasis added).

Later Supreme Court case law makes clear that sovereign immunity must be continuously and prospectively assessed even after filing. In *Republic of Iraq v. Beaty*, 556 U.S. 848, 865 (2009), for instance, the Court concluded that the Government of Iraq's "immunity kicked back in" when then-President Bush waived application of the state-sponsored terrorism exception of the FSIA. "[T]he [court] lost jurisdiction" immediately. *Id*. at 865; *see also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 468 (2007) ("[A] clear and explicit *withdrawal* of jurisdiction *withdraws* jurisdiction.") (first emphasis in original.); *Zuza v. Off. of the High Representative*, 857 F.3d 935, 938 (D.C. Cir. 2017).

**D.**   **Even If A "Foreign State" Under The ATA Did Not Include State-Owned Enterprises, Sberbank Would Still Be Presumptively Immune as an "Agency" Of The Russian Federation**

Sberbank is a "foreign state" under the ATA because it is a "foreign state" under the State Ownership Clause of the FSIA. 28 U.S.C. § 1603(b). Yet even if one assumes that "foreign state" does not mean the same thing under the ATA as it does under the FSIA, Sberbank would still be presumptively immune under the ATA as an "agency" of a foreign state. 18 U.S.C. § 2337(2).

Sberbank would still be presumptively immune because, if one assumes that the ATA does not draw its meaning of "foreign state" from the FSIA, it follows that the ATA does not draw its meaning of "agency" from the FSIA either. That presents a dilemma: how *does* the ATA define an "agency" of a "foreign state" when those terms are read in isolation from the FSIA?

The ATA is codified within Title 18, which defines "agency" of the United States. 18 U.S.C. § 6. That definition illuminates the meaning of "agency" of a foreign state, because Section 2337 of the ATA immunizes both the United States and foreign states using virtually identical text:

No action shall be maintained under section 2333 of this title against—

(1) the United States, an agency of the United States, or an officer or employee of the United States or any agency thereof . . .; or

(2) a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof . . . .

29

"Agency" should therefore carry the same meaning in both clauses because, again, courts ordinarily ascribe the same meaning to the same terms. *IBP*, 546 U.S. at 34. Interpreting "agency" of the United States to mean something different than "agency" of a foreign state would introduce inconsistency into a statutory provision that uses the *same* operative language side-by-side, almost verbatim.

An "agency of the United States" under Title 18 unambiguously includes government-owned entities; specifically "any corporation in which the United States has a proprietary interest . . . ." 18 U.S.C. § 6. An "agency of a foreign state" under the ATA should likewise include a corporation in which that *foreign* state has a proprietary interest.

Because the Russian Ministry of Finance "owns stock" in Sberbank, moreover, the Russian Federation has a "proprietary interest" in Sberbank. *See Veneruso v. Mount Vernon Neighborhood Health Ctr.*, 933 F. Supp. 2d 613, 631 (S.D.N.Y. 2013), *aff'd*, 586 F. App'x 604 (2d Cir. 2014) (applying "agency" and "proprietary interest" under the removal statute). Accordingly, even if the Court were to read "foreign state" under the ATA in total isolation from "foreign state" under the FSIA (and it should not) Sberbank would nevertheless be an "agency" of the Russian Federation within the meaning of Title 18.

## II.   THE ATA PROVIDES ONLY ONE EXCEPTION TO ITS SEPARATE GRANT OF SOVEREIGN IMMUNITY: CLAIMS FOR INJURIES CAUSED BY TERROR ATTACKS WITHIN THE UNITED STATES

The ATA has only one exception to its separate grant of sovereign immunity: the JASTA exception, permitting claims seeking recovery for injuries sustained in the United States by reason of an act of international terror in the United States.  28 U.S.C. § 1605B.  Because Plaintiffs bring claims solely under the ATA for an attack conducted by non-parties in Ukraine, Sberbank is immune from this lawsuit.

### A.   The District Court Wrongly Concluded Without Analysis that the ATA and FSIA Are in All Respects "Functionally Equivalent"

The district court instead concluded that an assertion of sovereign immunity under the ATA and FSIA are "functionally equivalent" in all respects, including (by implication) in the scope of their exceptions.  In so stating, the court purported to rely on the First Circuit's decision in *Ungar*,.  (SPA 11) (citing *Ungar*, 402 F.3d at 283).  But *Ungar* is much more careful, stating only that "we regard an *assertion* of sovereign immunity under the ATA, 18 U.S.C. § 2337(2), as being functionally equivalent to an *assertion* of sovereign immunity under the FSIA, *28 U.S.C. § 1604.*"  *Id*. at 283 (emphasis added).  That provision, 28 U.S.C. §1604, does not set forth the *exceptions* to sovereign immunity under the FSIA; it sets forth the *rule* of presumptive immunity.  28 U.S.C. § 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.")

31

*Ungar*, then—and the district court by implication—rightly recognized that "an assertion" of *presumptive* immunity under Section 1604 of the FSIA and the ATA are functionally equivalent. *Ungar*, 402 F.3d at 283. *Ungar* did not recognize or even suggest, however, that the *exceptions* to the FSIA apply under the ATA. To the contrary, *Ungar* did not even mention any of the exceptions to the FSIA, other than to state that they "[are] not relevant here." *Id*. at 282. That is so because *Ungar* primarily decided an issue of presumptive immunity: whether the Palestinian Authority possesses the "essential attributes of statehood" required to make it a foreign state. *Id*. at 283.

The district court was therefore right to rely on *Ungar* for its conclusion that the ATA and FSIA must be read *in pari materia*. But the district court was wrong to draw on *Ungar* for the broader conclusion that the FSIA and ATA are in all respects "functionally equivalent." *Ungar* does not say that.[5]

### B.   The Only Provision that Abrogates ATA Sovereign Immunity is the JASTA Exception

The question remains whether there is any basis to conclude that the commercial activity exception to the FSIA pierces the ATA, even though the JASTA exception is the *only* provision found anywhere in the U.S. Code that explicitly repeals the ATA's immunity provision.

---

[5] Neither does *Sokolow v. Palestine Liberation Organization*, 583 F.Supp.2d. 451, 457 (S.D.N.Y. 2008), which the district court similarly misread.

No case has ever held that the commercial activity exception abrogates ATA immunity. None. Plaintiffs acknowledged that dearth of authority in a hearing before the assigned magistrate, Judge Gorenstein, on whether to stay discovery pending the district court's determination of Sberbank's motion to dismiss. (A. 274-75). In response to the magistrate's question whether "[b]efore JASTA, 201[6] and earlier, was there a commercial activity exception for a suit under the ATA?" (A. 274:21-23), Plaintiffs conceded that they were "not aware of a case that frames that specific question." (A. 275:21-22).

When examining the two statutes, moreover, there are only four possibilities: (i) that the text of the commercial activity exception itself abrogates the ATA; (ii) that, when Congress passed the ATA in 1992, it intended *sub silentio* that the ATA's blanket immunity provision would be subject to the general commercial activity exception; (iii) that some subsequent amendment to the FSIA or ATA made Congress' previously total grant of sovereign immunity for ATA claims subject to the commercial activity exception; or (iv) that JASTA itself—in which Congress for the first time indisputably abrogated ATA sovereign immunity, but only for domestic terror—also impliedly imported the commercial activity exception applicable under the ATA. The answer to all four questions is no.

33

1. *The Text of the Commercial Activity Exception Does Not Support the Interpretation that it Abrogates Sovereign Immunity Under the ATA*

When Congress passed the FSIA in 1976, it created five general exceptions to sovereign immunity, PL 94–583, 90 Stat 2891. One of these is the commercial activity exception, which lifts immunity for claims:

> [B]ased upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a).

In marked contrast to the JASTA exception, which specifically abrogates the ATA's immunity provision, 28 U.S.C. § 1605B, nothing in the text of the commercial activity exception abrogates immunity under the ATA.

That would have been no surprise in 1976, of course, for the simple reason that the ATA did not yet exist and would not exist until 1992. More strikingly, though, Congress has *never* amended the commercial activity exception. *Compare* PL 94–583, § 1605(a)(2) *with* 28 U.S.C. § 1605(a)(2). As it exists today, the exception remains identical to its 1976 version. At no time, then, has the text of the exception even referred to the ATA, even though Congress knows very well how to circumscribe ATA sovereign immunity: that is precisely what it did in 2016 with the

34

JASTA exception. Plaintiffs' resort to the commercial activity exception can find no support in the text of the commercial activity exception itself.

> 2. *When Congress Passed the ATA, It Did Not Expressly or Impliedly Make the ATA's Grant of Sovereign Immunity Subject to the Commercial Activity Exception*

When Congress enacted the ATA in 1992, it completely immunized foreign states and agencies against claims under the civil remedies provision of the ATA. PL 102–572, 106 Stat 4506, 4523-24. Congress included no exception to this specific grant of immunity to foreign states against ATA claims.

Congress, moreover, could not have not intended *sub silentio* that the new ATA's sovereign immunity provision would be subject to the existing 1976 exceptions of the FSIA. The FSIA is a general statute governing claims against foreign sovereigns, whereas the ATA is a specific statute governing claims against foreign sovereigns *for acts of international terrorism*. 18 U.S.C. § 2333(a). As their titles show, the FSIA sets forth the "*General* Exceptions to the Jurisdictional Immunity of a Foreign State," 28 U.S.C. § 1605; whereas the lone exception to ATA immunity—the JASTA exception—specifically sets forth the "Responsibility of foreign states for international terrorism against the United States." 28 U.S.C. § 1605B [6]

---

[6] "To be sure, a subchapter heading cannot substitute for the operative text of the statute. Nonetheless, statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute." *Fla. Dep't of Revenue v.*

Under "well established canon[s] of statutory interpretation," the ATA's later-enacted and *specific* sovereign immunity provision must therefore trump the FSIA's *general* exceptions to sovereign immunity. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). "[T]he specific governs the general," as the Supreme Court has stated, and "that is particularly true where"—as here— "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Id*.

As this Court has explained, moreover, "[a]n earlier-enacted statutory requirement"—such as the 1976 commercial activity exception under the FSIA— "cannot prevent the 'plain import' or 'fair implication' of a later-enacted statute from taking effect"—such as the blanket immunization of foreign states against ATA claims set forth in 1992 in the ATA itself. *Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 984 F.3d 30, 34 (2d Cir. 2020) (quoting *Dorsey v. United States*, 567 U.S. 260, 275, 132 S.Ct. 2321, 183 L.Ed.2d 250 (2012)).

The "plain import" of the ATA leaps off the page: "[n]o action shall be maintained" under the ATA's civil remedies provision against "a foreign state." 18 U.S.C. § 2337. Within that precise sphere—the maintenance of an *ATA* action

---

*Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (citations and quotation marks omitted).

against a foreign state—the 1992 ATA's grant of immunity, subject to no exceptions within the statute itself, must control over the general exceptions of the 1976 FSIA.

The contemporaneous 1992 Senate Report on the Federal Courts Administration Act dispels any remaining doubt that Congress did not silently intend that the newly enacted ATA's blanket grant of sovereign immunity yield to the FSIA's existing commercial activity exception. On the contrary, the Senate Report explained that:

> This provision maintains the status quo, in accordance with the Foreign Sovereign Immunities Act, with respect to sovereign states and their officials: there can be no cause of action for international terrorism against them.

S. REP. NO. 102-342, at 47 (1992). The "status quo" in 1992, then, was this: the ATA's sovereign immunity provision admitted no exceptions. *Id.*

### 3. No Subsequent Amendment to the FSIA or ATA Prior to JASTA Abrogated the ATA's Immunity Provision

In 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") created the first FSIA immunity exception to expressly authorize personal injury claims by victims of terrorism, Pub. L. 104-132, Title II.B, § 221, 110 Stat 1214 (1996), followed shortly by an amendment creating a new cause of action against officials of foreign states, commonly known as the Flatow Amendment. Pub. L. No. 104-208, Div. A, Title I, § 101(c), 110 Stat. 3009-172 (1997) (codified at 28 U.S.C. § 1605 note); *see also Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024,

1029 (D.C. Cir. 2004).  After a circuit split developed over whether the Flatow Amendment also permitted actions against foreign states themselves, Congress stepped in to confirm that it did with the 2008 National Defense Authorization Act. Pub. L. 110-181, Div. A, Title X, § 1083(a)(1), 122 Stat. 338 (2008).  Collectively, these acts: (i) recognized a new claim for injuries to nationals of the United States "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act"; and (ii) abrogated sovereign immunity for such claims against a foreign state, so long as that state is a designated state sponsor of terror.  28 U.S.C. § 1605A.

None of these provisions, however, amended the immunity provision of the ATA, or amend the ATA in any other respect.  Nor did any of these provisions amend any of the existing exceptions to the FSIA, or make them applicable to the ATA.

### 4. *Before JASTA, No Court Ever Held that Parties Could Bring Claims Against Foreign States Under the ATA*

By 2016, then—even though Congress had deliberately permitted terror-related claims against state-sponsors of terror through a new exception to the FSIA—it had left the ATA's immunity provision entirely untouched.

The FSIA and ATA thus continued to govern their own spheres.  Victims of terrorism could bring *non*-ATA tort and statutory claims against foreign states if their claims fit within a general exception to FSIA immunity.  *See, e.g., Smith v.*

38

summary

*Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 241 (2d Cir. 1996). Injured parties could not, however, bring *any* claims against foreign states *under the ATA itself. See Lawton v. Republic of Iraq*, 581 F. Supp. 2d 43, 46 (D.D.C. 2008).

Prior to JASTA, all of the district courts which addressed that question shared that conclusion. The District of Columbia, for instance, reasoned that "[a] plain reading of [the ATA's sovereign immunity provision] indicates that the ATA bars [civil liability] claims against foreign states." *Id*.

Likewise, the Southern District of New York rejected the argument that, "once a[n] FSIA exception is established, the ATA exemption is overcome and the ATA becomes available as a basis for pursing claims against a foreign state." *Id*. at 45. Rather, as that court explained, "18 U.S.C. § 2337 appears to expressly foreclose an action against [the foreign state] and its leader." *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 225 (S.D.N.Y. 2003).

Prior to JASTA, moreover, no decision by any district court or court of appeals appears to have reached the opposite conclusion: that sovereign immunity under the ATA yields to the general exceptions of the FSIA.[7]

---

[7] Below, Plaintiffs maintained that this Court's decision in *Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011) suggested otherwise. But *Doe* is not to the contrary, first and foremost because none of the putative sovereign defendants in that appeal invoked the separate immunity provision of Section 2337 of the ATA. Rather, defendants relied *solely* on the general grant of immunity in Section 1604 of the FSIA, which no one disputes is subject to the general exceptions of Section 1605. *Id* at 65. Second, rather than address the issue here—whether any subsequent amendment to

Plaintiffs injured in or as a result of terror attacks were and remain free to assert *non*-ATA claims against foreign states under any FSIA exception that may apply. Until 2016, however, Plaintiffs could not bring any ATA claims for such injuries against a foreign state, regardless of whether an FSIA exception applied.

> 5. *In 2016 JASTA Created the Lone ATA Immunity Exception for Terror Attacks Within the United States, But JASTA Did Not Incorporate the Commercial Activity Exception*

In 2016, Congress enacted the JASTA exception, the first and still only provision to expressly and unambiguously pierces the ATA's separate immunity provision:

> (b) Responsibility of foreign states. –A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—
>
> > (1) an act of international terrorism in the United States; and
> >
> > (2) a tortious act or acts of the foreign state . . . .
>
> (c) Claims by nationals of the United States. – *Notwithstanding section 2337(2)* of title 18, a national of the United States may bring a claim against a foreign state in accordance with *section 2333* of that title if the foreign state would not be immune under subsection (b).

28 U.S.C. § 1605B (emphasis added).

---

the FSIA changed the 1992 status quo under the ATA by *adding* the FSIA's exceptions as a basis to pierce ATA immunity—*Doe* answered the inverse question: whether the Flatow Amendment implicitly *eliminated* the FSIA's general exception for non-commercial torts if the tort in question arose from a terror attack.

Accordingly, "JASTA now permits United States nationals to bring claims against foreign sovereigns under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, *provided that* JASTA's requirements for withholding sovereign immunity are otherwise met." *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 639 (S.D.N.Y. 2018) (emphasis added).

Nothing in this new provision incorporated the commercial activity exception or any other existing exception to the FSIA. To the contrary, JASTA's express textual abrogation of ATA immunity, complete with precise cross-referencing to the ATA—text that is glaringly absent from *every* other exception to the FSIA— underscores that no previous FSIA exception ever abrogated the ATA's immunity provision in the first place, including the commercial activity exception. *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text [i.e. the commercial activity exception] requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute [i.e. the JASTA exception] that it knows how to make such a requirement manifest.")

41

III.   **MAINTAINING THE SEPARATION BETWEEN ATA SOVEREIGN IMMUNITY AND THE COMMERCIAL ACTIVITY EXCEPTION BEST COMPORTS WITH THE NATURE, PURPOSES, AND CONGRESIONALLY PRESCRIBED LIMITATIONS OF THE ATA AND FSIA**

The notion that the commercial activity exception pierces ATA immunity finds no support in the text or structure of the FSIA, ATA, or any of their amendments.  What is more, the purpose, history and express limitations of the FSIA, ATA and JASTA all point to that same conclusion: sovereign immunity under the ATA cannot be subject to the commercial activity exception.

A.   **Foreign Sovereign Immunity Exists to Protect the United States in Its Dealings Abroad, Avoid Friction in International Relations, and Harmonize International Law**

"Foreign sovereign immunity is a matter of 'grace and comity'. . . ."  *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1605 (2020) (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 689).  But sovereign immunity is also a clear-eyed exercise in "reciprocal self-interest."  *Nat'l City Bank of New York v. Republic of China*, 348 U.S. 356, 362 (1955).

It is for this reason that the Supreme Court has "exhort[ed]" the courts "to demonstrate due respect for . . . any sovereign interest expressed by a foreign state." *Broidy Cap. Mgmt. LLC v. Muzin*, No. 22-7082, 2023 WL 2439809, at *1 (D.C. Cir. Mar. 10, 2023) (quoting *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 546 (1987)).  The Court thus "interpret[s] the

FSIA" in a manner designed "to avoid, where possible, 'producing friction in our relations with [other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation.'" *Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 714 (2021). More colloquially, "in the law, what is sauce for the goose is normally sauce for the gander." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 349 (2016).

It is for this reason as well that the State Department, when it "helped to draft the FSIA's language," sought to harmonize the new statute with customary international law; that is, what it "believe[d] to be the general state of the law internationally, so that we conform fairly closely . . . to our accepted international standards." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 181.

### B. The ATA Is Ultimately a Criminal Statute, Not a Commercial Regulation, And Its Extraterritorial Reach Would Dramatically Increase Friction in International Relations If Unchecked by Sovereign Immunity

Consistent with customary international law, then, when the State Department drafted the FSIA it adopted the by-then-prevailing restrictive theory of sovereign immunity. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983). Under the restrictive theory—broadly speaking—immunity attaches to a state's sovereign acts, but does not attach to certain commercial transactions. *Id.*

The ATA, however, is not commercial regulation, even though certain types of commerce may lead to liability under the ATA. Rather, the ATA is at bottom a *criminal* statute, with a civil tort provision requiring violation of an underlying *criminal* law. 18 U.S.C. § 2333(a) (providing tort remedy for persons injured by reason an "act of international terrorism"); 18 U.S.C. § 2331(1)(A) (defining "international terrorism" as acts "that are a violation of the criminal laws of the United States or of any State" or "that would be a criminal violation" if committed in the United States); *see also Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 6 (D.D.C. 2005) ("[T]he basic elements of [an ATA] claim lie in tort.")

When a plaintiff brings a tort claim under the ATA it is necessarily accusing the defendant of a "violation of the criminal laws of the United States"—which is to say, in this context, that it is accusing a foreign state of a crime. Indeed, such is the case here, where plaintiffs accuse defendants of violating 18 U.S.C. §§ 2339A and 2339C. (A. 165-67 ¶ 402; A. 167 ¶ 412).

Although the FSIA does not bar the Executive Branch from formally *prosecuting* a foreign state, *see Turkiye Halk Bankasi*, 16 F.4th at 347, the Executive Branch presumably makes such momentous decisions only after due consideration of the diplomatic ramifications. A private civil action under the ATA has no such diplomatic guardrails, even though a finding of liability under the ATA requires a finding that the foreign state committed a crime. The Attorney General *may* seek a

stay of private proceedings, but can only do so in favor of a pending criminal case. 18 U.S.C. § 2333(c)(1).

By design, moreover, the ATA has extensive extraterritorial reach: Indeed, the ATA reaches *only* "international terrorism," defined among other things as activities that "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries . . . ." 18 U.S.C. § 2331.

It is not hard to envision the potential foreign policy friction that may entail when private parties seek to brand *foreign states themselves* as criminals without the protections of criminal procedure or the participation of the Executive Branch under a statute that—by its very design—reaches events primarily occurring in foreign territory. The Department of Justice has certainly seen it, resisting a broad interpretation of the ATA even in cases against *non*-sovereigns located overseas: "Permitting liability to sweep so broadly could reach and inhibit routine activities and, given the ATA's extraterritorial reach, could adversely affect the United States' relationships with foreign Nations." Br. for United States as Amicus Curiae 14-15, *O'Neill v. Al Rajhi Bank*, 2014 WL 2202862 (U.S.).

Suits against foreign states under the ATA sit very uneasily with the need to "respect the independence and dignity of every" sovereign in international relations—"including our own." *Helmerich*, 581 U.S. at 179.

45

No surprise, then, that the ATA included its own specific grant of sovereign immunity, or that "in accordance with the Foreign Sovereign Immunities Act," Congress in 1992 permitted no exceptions to that immunity. S. REP. NO. 102-342, at 47. Applying the commercial activity exception to the ATA would have been a momentous step, and if Congress had in fact wanted the commercial activity exception to apply, it could and should have said so explicitly—just as it did in JASTA.

**C.     With JASTA, Congress and the President Recognized the Dramatic Potential Harms Arising From a Repeal of Sovereign Immunity Under the ATA**

Indeed, it is not hard to see the potential friction arising from the JASTA exception itself. Certainly Congress and the President had such potential friction at the top of mind when JASTA passed in 2016. During debate over JASTA, Senator McCain explained that, with respect to sovereign immunity: "No country in the world stands to lose more from an erosion of these legal standards than the United States of America. The United States has more bases and more forward-deployed personnel protecting peace and security than any other country." 162 CONG. REC. S6898, at S6899 (Dec. 8, 2016).

President Obama shared that assessment, vetoing the bill because in his view it "undermine[d] core U.S. interests." Veto Message From the President – S.2040, 2016 WL 5334803, at *2 (Sep. 23, 2016). In his veto message, the President further

explained that JASTA: "Would upset longstanding international principles regarding sovereign immunity, putting in place rules that, if applied globally, could have serious implications for U.S. national interests. The United States has a larger international presence, by far, than any other country, and sovereign immunity principles protect our Nation and its Armed Forces, officials, and assistance professionals, from foreign court proceedings. . . ." *Id*.

The President also warned of JASTA's "threat[] to create complications in our relationships with even our closest partners." *Id*. at *3. The President was not merely speculating, he was hearing it directly from our allies: "A number of our allies and partners have already contacted us with serious concerns about the bill. By exposing these allies and partners to this sort of litigation in U.S. courts, JASTA threatens to limit their cooperation on key national security issues, including counterterrorism initiatives, at a crucial time when we are trying to build coalitions, not create divisions." *Id*.

Congress responded by overriding the veto, but these concerns did not go unheeded, as the JASTA exception ultimately includes several key limitations, most notably its restriction to claims for injuries in domestic terror attacks. 28 U.S.C. § 1605B(b).

**D. Congress Declared in JASTA Itself That JASTA's Limitation to Claims for Injuries in the United States Is a Necessary Component of the Broadest Possible Relief Against Foreign States**

As Congress explained in its statement of findings and purpose, the JASTA exception's domestic territorial restriction is essential, because the JASTA exception constitutes "the broadest possible basis" for relief against foreign states "consistent with the Constitution of the United States." *See* Pub. L. 114-222 § 2(b), 130 Stat. 852, at 853; *see also Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 76 (2d Cir. 2023) ("Congress explained that the purpose of the amendments was 'to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against . . . foreign countries.")  In Congress' judgment, then, this territorial limitation—injuries in the United States—is itself a necessary component of "the broadest possible basis" for relief against foreign states who engage in or support acts of international terror under the ATA.

The commercial activity exception, however, includes no such territorial limitation.  28 U.S.C. § 1605(a)(2).  On the contrary, as discussed in greater detail below in Section IV, it can apply both to commercial activity in the United States and outside the United States.  Combining the extraterritorial scope of the commercial activity exception with the extraterritorial scope of the ATA, therefore, would at a stroke expand potential foreign state liability under the ATA far beyond a territorial restriction that *Congress itself* deemed an essential part of the *broadest*

48

*possible* basis for relief against foreign states. It would also flout the Executive's concern that even the JASTA exception alone posed serious risks to the United States and its allies. And it would flout the Supreme Court's command to construe matters of sovereign immunity in a manner calculated to avoid friction in foreign relations. Such a rule would thus hit a dubious trifecta, contravening the expressed views of all three branches of government.

In the absence of *any* textual cue in the FSIA, ATA, or JASTA that Congress intended that result, or *any* previous precedent holding the commercial activity exception applicable to the ATA, this Court should not so hold either. "United States law governs domestically but does not rule the world." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013).

## IV. EVEN ASSUMING FOR THE SAKE OF ARGUMENT THAT THE COMMERCIAL ACTIVITY EXCEPTION CAN APPLY TO CLAIMS UNDER THE ATA, THAT EXCEPTION CANNOT APPLY HERE

The commercial activity exception to the FSIA cannot pierce sovereign immunity under the ATA. Even if it could, however, it would not apply to Plaintiffs' ATA claims here. The exception only applies to claims "based on" commercial activity, and a claim is not based on commercial activity unless that activity is the core conduct that actually injured the plaintiff. Here, the core conduct that injured Plaintiffs was the DPR's attack on MH17, not Sberbank's alleged provision of financial services to the DPR's supporters.

### A. The FSIA's Burden-Shifting Framework for Determining Sovereign Immunity

This Court explained the burden-shifting framework for assessing sovereign immunity in *Virtual Countries, Inc. v. Republic of S. Afr.*, 300 F.3d 230, 241 (2d Cir. 2002). First, the putative sovereign must "present a 'prima facie case that it is a foreign sovereign.'" *Id.* Next, the evidentiary burden shifts to plaintiff: "*the plaintiff* 'has the *burden of going forward* with evidence showing that, under exceptions to the FSIA, immunity should not be granted.'" *Id.* (emphasis in original). While the ultimate burden of persuasion "remains with the alleged foreign sovereign," Plaintiffs' failure "to come forward with evidence to meet its burden of production in order to prevail on the jurisdiction issue" will defeat the exception. *Id.*

### B. The Three Prongs of the Commercial Activity Exception

The FSIA's commercial activity exception creates an exception to sovereign immunity for claims "based upon" three types of commercial activity:

(i) [A] commercial activity carried on in the United States by the foreign state;

(ii) [A]n act performed in the United States in connection with a commercial activity of the foreign state elsewhere; and

(iii) [A]n act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605.

The common element to these three prongs of the commercial activity exception is the phrase "based upon." The Supreme Court has closely and carefully defined that phrase to encompass only the conduct that "actually injured" the plaintiff. *Sachs*, 577 U.S. at 35. The district court overlooked that precedent and therefore erred in holding that Plaintiffs' claims are "based upon" Sberbank's financial services, rather than the DPR's attack.

### C. To Determine Whether a Claim is "Based Upon" Commercial Activity, the Courts Must First Identify the Core of the Suit -- the Conduct that Actually Injured the Plaintiff

To determine whether a lawsuit is "based upon" commercial activity, courts must "zero in" on the "core" of the lawsuit—the conduct that "actually injured" plaintiffs—not whether commercial activity constitutes one element of the overall claim. *Id.* at 27.

*Sachs* determines the outcome here. In *Sachs*, the plaintiff brought ordinary negligence claims against Austria's state-owned rail carrier for severe injuries she sustained when attempting to board a moving train in Austria. The Ninth Circuit permitted her claim to move forward, reasoning that a claim is "based upon" commercial activity in the United States if that activity constitutes "an element" of the claim. *Sachs v. Republic of Austria*, 737 F.3d 584, 599 (9th Cir. 2013).

Plaintiff had purchased a Eurail pass from the Austrian rail carrier's agent in the United States. Looking to ordinary tort rules, the Ninth Circuit reasoned that this

purchase established the common law duty of care required in any claim for negligence. *Id.* at 600. Accordingly, the court determined that because "the sale of the Eurail pass in the United States is 'necessary to the 'duty of care' element of [Sachs's] negligence claim,'" the commercial activity exception defeated the rail carrier's sovereign immunity.

The Supreme Court rejected that "one element" test and reversed, bluntly stating that "our analysis in *Nelson* is flatly incompatible with a one-element approach." Warning that "any other approach would allow plaintiffs to evade the [FSIA's] restrictions through artful pleading," *id.* at 36, the Court explained instead that "an action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit." *Id.* at 35 (quoting *Nelson*, 507 U.S. at 538). And the gravamen of the suit—its "core"—consists of the "acts that actually injured plaintiffs." *Id.* Further reasoning that "[a]ll of [plaintiff's] claims turn on the same tragic episode in Austria," the Court concluded that "the 'essentials' of her suit . . . are found in Austria." The exception, therefore, did not apply.

This Court's precedents both echo and anticipate *Sachs*, particularly *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384 (2d Cir. 2000), another critical precedent overlooked by the district court. In *Transatlantic Shiffahrtskontor*, this court explained that the proximal connection between the alleged commercial activity and the injury to plaintiffs must be

"considerably greater" than the closeness of connection required to establish proximate causation:

> What does 'based upon' mean? At a minimum, that language implies a causal relationship. Thus, at the least, the 'act that caused a direct effect in the United States' ('the Act') must be a 'but for' cause of the judgments that are the ground of this suit. . . . But this is not enough. . . . '[B]ased upon' requires a degree of closeness between the acts giving rise to the cause of action and those needed to establish jurisdiction that is considerably greater than common law causation requirements.

*Id*.; *see also Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 155-56 (2d Cir. 2007).

### D. The Core of Plaintiffs' Claims is the Attack On MH-17, Which Is Not Commercial Activity

Here, the district court erroneously determined that the core of the lawsuit, its "gravamen," was Sberbank's "operat[ion of] correspondent accounts in New York, and [allowance of] transfers to a specific Sberbank bank card."  In so doing, the district court never determined or even considered whether the use of such accounts and provision of such services "actually injured" Plaintiffs: a clear misapplication of the Supreme Court's standard in *Sachs* and this Court's holding in *Transatlantic Shiffahrtskontor*.

Under Plaintiffs' own theory of the case, transfers through Sberbank did not actually injure them, but rather "allowed the DPR to acquire lethal equipment." (A. 71 ¶ 13).  Those weapons, in turn, allowed the DPR to maintain its insurgency "and to acquire and control territory" from which it attacked MH-17.  (A. 160 ¶ 161). Those intervening causes actually injured Plaintiffs and absent those intervening

53

causes Plaintiffs would have suffered no injury from the alleged funds transfers at all.

The conduct that actually injured Plaintiffs was the DPR's heinous attack on MH-17. Schansman died "at the hands" of the DPR. (A. 73 ¶ 22). That attack was not a commercial act, it was a deliberate assault.

### E. None of Sberbank's Alleged Activity Fits Within Any of the Three Prongs of the Commercial Activity Exception

Because the core of this lawsuit is not commercial activity by Sberbank—or even any actions by Sberbank at all— but rather the DPR's attack on MH17, none of the three prongs of the commercial activity exception can apply. That ends the analysis.

The commercial activity exception, moreover, cannot apply because none of the acts and activity attributed to Sberbank establish any of the three prongs of the exception.

### 1. Sberbank's Maintenance of Correspondent Banking Accounts in the United States Does Not Satisfy the First Prong of the Commercial Activity Exception

Plaintiffs generally allege that Sberbank processed substantial funds through its correspondent accounts that ultimately flowed to the DPR and its supporters. When seeking to pierce sovereign immunity, however, allegations alone will not suffice: what counts is *evidence*.

The only evidence of transfers to the DPR through Sberbank's U.S. correspondent accounts consists of bank records purporting to establish two transfers totaling $300. (A. 112, ¶ 191; A. 64) This is woefully insufficient to establish that Plaintiffs' claims are "based upon" Sberbank's banking services in the United States, as the first prong of the commercial activity exception requires.

Plaintiffs' theory is that the DPR used funds transferred to its supporters using defendants' banking services to acquire an arsenal of sophisticated military equipment that it then used to take and hold territory in Ukraine: sniper rifles, heavy machine gun optical sights, reconnaissance UAVs, thermal imaging devices, body armor, radios, even armored vehicles and—possibly—the vehicle-mounted Buk missile system that likely downed MH17. (A. 86, ¶ 79; A. 109, ¶ 181; A. 112, ¶ 193; A. 114-15, ¶¶ 202-203; A. 122, ¶ 231; A. 123-24, ¶¶ 233-235). Having acquired this material, the DPR was then able to plan and carry out "lethal" and "tactical" activities and acquire the territory from which it attacked MH17. (A. 104-05, ¶¶ 160-61). Plaintiffs do not allege, however (let alone offer evidence) that the $300 transferred through Sberbank's U.S. correspondent accounts actually allowed the DPR to assemble this dangerous material. Nor could they, as the notion that the DPR built its war machine on $300 is implausible on its face.

Those transfers might—*might*—establish a sufficient nexus to the United States to establish specific personal jurisdiction (the district court concluded they

did, in an order not under appeal). (ECF No. 185 at 9-10). Those transfers also might—*might*—establish a basis for liability under the ATA, so long as Plaintiffs could prove the ATA's many other elements. *See generally Rothstein v. UBS AG*, 708 F.3d 82, 96-97 (2d Cir. 2013). Those two transfers, however, cannot possibly constitute the "core" of the lawsuit, the conduct that "actually injured" Plaintiffs, because they do not meet the actual injury test in *Sachs* or the strict causation this Court required in *Transatlantic Shiffahrtskontor*.

Three-hundred dollars does not build an army. Plaintiffs have therefore failed to submit evidence establishing that their claims are "based upon" Sberbank's maintenance of correspondent accounts *in the United States*.

### 2. Plaintiffs Allege No "Acts" in the United States by Sberbank Within the Meaning of the Second Prong of the Commercial Activity Exception

The term "acts" under the second prong of the commercial activity exception "is generally understood to apply to *non*-commercial acts in the United States that relate to commercial acts abroad." *Kensington*, 505 F.3d at 157 (emphasis added). The only conduct alleged to have been undertaken by Sberbank in the United States is its maintenance of correspondent accounts. Plaintiffs do not allege—and certainly have not evidenced—"any non-commercial acts performed by" Sberbank that "form[] the basis of its complaint." *Id*. For that reason alone, the second prong of the commercial activity exception cannot apply.

3. *Plaintiffs Allege No "Direct Effect" in the United States and Therefore Cannot Invoke the Third Prong of the Commercial Activity Exception*

The district court did not consider the third prong of the commercial activity exception: overseas commercial activity that caused a "direct effect" in the United States. But that exception cannot apply either, even assuming the claim is "based upon" Sberbank's overseas banking services, because that activity caused no direct effect in the United States.

As this Court has recently reiterated: "[A]n effect is direct' for purposes of the commercial activity exception only 'if it follows as an immediate consequence of the defendant's activity.'" *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 135 (2d Cir. 2022) (quoting *Weltover*, 504 U.S. at 618). In contrast, where the putative effect "falls at the end of a long chain of causation and is mediated by numerous actions by third parties," the effect is not direct. *Virtual Countries*, 300 F.3d at 237. Here, even crediting all of the allegations of the Second Amended Complaint, Sberbank's overseas banking activity caused no direct effect because of the long chain of causation and the mediating actions of numerous third-parties that led to the attack on MH-17: the fundraisers soliciting the money on the DPR's behalf, the donors transferring the funds, the DPR's supporters and leadership acquiring the weapons, equipment, and territory from which it launched the attack, and the unidentified perpetrators of the attack itself.

57

Moreover, *even the attack itself* did not cause a "direct" effect under prevailing law. "[T]he mere fact that a foreign state's commercial activity outside of the United States caused physical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States." *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 78 (2d Cir. 2010). Rather, "the place where a direct effect is felt is generally 'the locus of a tort. . . .'" *Daou*, 42 F.4th at 135; *see also Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 109 (2d Cir. 2016) ("A tort's locus . . . is the place 'where the last event necessary to make an actor liable for an alleged tort takes place.'" (quoting Restatement of Conflict of Laws § 377 (1934)).

The direct effect of the attack itself therefore occurred in Ukraine, not the United States, and Plaintiffs have neither alleged nor proven any other direct effect in the United States.

Even assuming—without precedent and contrary to the text, structure, purpose, and history of the ATA and FSIA—that the commercial activity exception can pierce sovereign immunity under the ATA, the exception cannot apply here because Plaintiffs' claims are "based upon" the attack on MH-17, not Sberbank's alleged provision of banking services to DPR supporters.

58

## CONCLUSION

Sberbank is immune to both of Plaintiffs' claims under the ATA. The district court therefore lacked personal and subject matter jurisdiction under 28 U.S.C. § 1330 and should have granted Sberbank's motion to dismiss with prejudice. This Court should therefore reverse and remand with instructions to dismiss the case as against Sberbank with prejudice.

Dated:     March 21, 2023
           New York, New York

Respectfully submitted,

WILK AUSLANDER LLP

By:  /s/ Jay Auslander
     Jay S. Auslander
     Natalie Shkolnik
     Michael Van Riper
825 Eighth Avenue, Suite 2900
New York, New York 10019
(212) 981-2300

59

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing complies with the length limitations of Local Rule 32.1 because it is 13,667 words. It complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) because it is printed in 14-point Times New Roman font, which is a proportionally spaced font with serifs.

*/s/ Jay S. Auslander*

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2023, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.

*/s/ Jay S. Auslander*

**SPECIAL APPENDIX**

# TABLE OF CONTENTS

**Page**

Order of the Honorable Andrew L. Carter, Jr., dated
December 6, 2022, Appealed From ....................... SPA-1

28 U.S.C. § 1603.......................................................... SPA-13

28 U.S.C. § 1604.......................................................... SPA-15

28 U.S.C. § 1605.......................................................... SPA-16

28 U.S.C. § 1605B ....................................................... SPA-21

18 U.S.C. § 2333.......................................................... SPA-23

18 U.S.C. § 2337.......................................................... SPA-25

SPA-1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
**Thomas Schansman, et al.,**

                                    **Plaintiffs,**

          -against-                          :          **1:19-CV-02985 (ALC) (GWG)**
                                              :
**Sberbank of Russia PJSC et al.,**          :          <u>**ORDER**</u>
                                    **Defendants** :
--------------------------------------------------------- :
                                              - :x

**ANDREW L. CARTER, JR., United States District Judge:**

    Defendant Sberbank of Russia submits a motion to dismiss Plaintiffs' Second Amended

Complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject-matter

jurisdiction under the Foreign Sovereign Immunities Act (FSIA) and the Anti-Terrorism Act

(ATA). For the following reasons, Sberbank's motion to dismiss is denied.


## I.    BACKGROUND

    I assume the parties' familiarity with the facts, which are set forth more fully in the

Memorandum and Order denying Defendants' previous motion to dismiss. ECF No. 185. In short,

according to the original complaint and Second Amended Complaint ("SAC"), Defendants

Sberbank and VTB Bank provided material support and financing to the Donetsk People's

Republic, a terrorist group accused of downing a Malaysia Airlines flight over Eastern Ukraine in

2014.


## II.    STANDARD OF REVIEW

    Federal Rule of Civil Procedure 12(b)(1) allows for dismissal of a complaint for "lack of

subject matter jurisdiction." The Second Circuit has held that a motion to dismiss for one of the

non-waivable defenses under Rule 12(h) (such as lack of subject matter jurisdiction, at FRCP 12(h)(3)), is valid even after the answer is filed and should be construed as a motion for judgment on the pleadings under Rule 12(c). *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). Further, under Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.")

## III.  DISCUSSION

### A.  SOVEREIGN IMMUNITY CLAIMS

The FSIA "is the sole source for subject matter jurisdiction over any action against a foreign state." *Pablo Star Ltd. v. Welsh Government*, 378 F. Supp. 3d 300, 306 (S.D.N.Y. 2019)

As Sberbank noted in the Joint Status Report of Sept 13, 2022 at ECF No. 434: a sovereign defendant's waiver of immunity must "be 'unmistakable' and 'unambiguous.'" *Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*, 12 F.3d 317, 326 (2d Cir. 1993) (quoting *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991)). Here, although Sberbank repeatedly disclaimed sovereign immunity defenses at earlier stages of briefing, they raised the defense in the first paragraph of their answer to the second amended complaint. ECF No. 226. Therefore, the Court does not consider the question of whether Sberbank waived sovereign immunity at this time, and examines the merits of Sberbank's sovereign immunity defense.

The FSIA provides immunity to foreign states as well as to any "agency or instrumentality" of a foreign state. 28 U.S.C. § 1603(a); 28 U.S.C. § 1604. The FSIA defines "agency or instrumentality" as an entity:

(1) which is a separate legal person, corporate or otherwise, and

SPA-3

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless one of the limited exceptions enumerated in Sections 1605 through 1607 of the FSIA applies. 28 U.S.C. § 1604; *see Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *Pablo Star Ltd.*, 378 F. Supp.3d at 306. "When [a] defendant claims immunity under the FSIA and 'presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign.'" *Figueroa v. Ministry for Foreign Affairs of Sweden*, 222 F. Supp. 3d 304, 307 (S.D.N.Y. 2016) (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993)).

Determining whether a plaintiff has satisfied his burden "involves a review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and—if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue—resolution of disputed issues of facts." *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 175 (2d Cir. 2010) (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 80 (2d Cir. 2008) (internal quotation marks and alterations omitted)). At this stage, "when considering a motion to dismiss for lack of subject matter jurisdiction on the basis of

sovereign immunity, 'the Court generally must accept the material factual allegations in the complaint as true, but does not draw all reasonable inferences in the plaintiff's favor.'" *Pablo Star Ltd.*, 378 F. Supp. 3d at 306, quoting *Figueroa*, 222 F. Supp. 3d at 307. "[W]here jurisdictional facts are disputed, the Court has the power and obligation to consider matters outside the pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists." *Figueroa*, 222 F. Supp. 3d at 307.

Sberbank claims they have qualified as an "agency or instrumentality" of Russia since at least April 2020, because at that time, the Ministry of Finance of Russia became the majority shareholder of Sberbank. *See* Memorandum of Law in Support of Sberbank's Motion to Dismiss for Lack of Subject-Matter Jurisdiction under the Foreign Sovereign Immunities Act ("Sberbank FSIA Memo" at ECF 258) at 4. Sberbank also claims that they were in fact an "agency or instrumentality" before April 30, 2020 "by virtue of [Sberbank's] direct majority ownership by the Central Bank of the Russian Federation ("Bank of Russia")." ECF 258 at 12-13.

However, as Chief Justice Marshall once wrote, "[w]here there is no change of party, a jurisdiction depending on the condition of the party, is governed by that condition as it was at the commencement of the suit*." Conolly v. Taylor*, 27 U.S. 556, 565 (1829) (Marshall, C.J.)

The Supreme Court and the Second Circuit have agreed with the venerable Chief Justice in this regard, and have held that the determination of "agency or instrumentality" status is made at the time of the filing of suit. In *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003), the Supreme Court stated, "We think the plain text [of § 1603(b)(2)], because it is expressed in the present tense, requires that instrumentality status be determined at the time suit is filed." The Court grounded its holding in "the longstanding principle that 'the jurisdiction of the Court depends upon the state of things at the time of the action brought.'" *Id.; see also Bartlett v. Societe Generale de*

*Banque au Liban SAL*, 2021 WL 3706909, at *8 (E.D.N.Y. Aug. 6, 2021) The Second Circuit has followed the Supreme Court's ruling in *Dole*, stating that it "unequivocally [holds] that an entity's status as an instrumentality of a foreign state should be determined at the time of the filing of the complaint[.]" *Abrams v. Societe Nationale Des Chemins De Fer Francais*, 389 F.3d 61, 64 (2d Cir. 2004), *cert. denied,* 544 U.S. 975.

Therefore, the Ministry of Finance of the Russian Federation's acquisition of direct majority ownership of Sberbank as of April 30, 2020 is not at issue, and the Court does not consider whether this would confer "agency or instrumentality" status on Sberbank.

In turn, the Court now must examine Sberbank's argument that in fact, they were an "agency or instrumentality" of the Russian Federation before April 30, 2020 "by virtue of [Sberbank's] direct majority ownership by the Central Bank of the Russian Federation ("Bank of Russia")." ECF 258 at 12-13.

### B.   *SBERBANK'S STATUS BEFORE ITS ACQUISITION BY THE MINISTRY OF FINANCE*

Sberbank states that on April 4, 2019 (the date the original complaint was filed, ECF No. 1), Sberbank was directly, majority-owned by the Bank of Russia. *See* Tsvetkov Decl. ¶¶ 3-4 ("As of 4 April 2019 . . . the Bank of Russia (also called the Central Bank of Russia) owned a 50% plus one share stake of Sberbank's total authorized capital."); Tsvetkov Decl. Ex. A (Certificate from the Register of Securities Owners about Shareholders Holding One and More % of the Charter Capital as at 4 April 2019); *id.* Ex. B (excerpt from Sberbank's 2019 Annual Report). As such, Sberbank claims that they have been an "agency or instrumentality" of Russia all along, and are exempt from suit.

SPA-6

Plaintiffs contend that Sberbank was an "entity owned by an 'agency or instrumentality' at the time of filing," and therefore Sberbank is not entitled to a presumption of immunity. *See* Plaintiffs' Memorandum of Law in Opposition to Sberbank of Russia PJSC's Second Motion to Dismiss the Second Amended Complaint ("Pls.' Opp." at ECF No. 312) at 10.

If the Bank of Russia is an agency or instrumentality, then it is unlikely that Sberbank can also be one, as the Supreme Court has held that the chain of sovereign immunity does not extend beyond a direct link to a sovereign entity. ("We hold that only *direct* ownership of a majority of shares by the foreign state satisfies the statutory requirement." *Dole Food Co. v Patrickson*, 538 US 468, 474 (2003), emphasis added). Sberbank would then be subject to suit, without any need for further analysis of sovereign immunity.

In contrast, if Bank of Russia is a political subdivision, then Sberbank could be an agency or instrumentality majority owned by it, and thus covered by sovereign immunity.

The Court holds that 1) the Central Bank of Russia is a "political subdivision" of the Russian government, 2) Sberbank is an agency or instrumentality of the Russian government, and, crucially, 3) Sberbank is still subject to suit under the commercial-activity exception to the FSIA.

## C. *APPLYING THE SECOND CIRCUIT'S CORE FUNCTIONS TEST, CENTRAL BANK OF RUSSIA QUALIFIES AS A POLITICAL SUBDIVISION*

Courts within the Second Circuit use the "core functions test" from *Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006) to decide whether an entity is a "political subdivision" or an "agency or instrumentality" of a state. The test examines whether the "core functions" of the entity "are predominantly governmental or commercial." *Garb v. Republic of Poland*, 440 F.3d

6

**SPA-7**

579, 594 (2d Cir. 2006). "If an entity's core functions are predominantly governmental, then it is a political subdivision. If the entity's core functions are predominantly commercial, then it is an agency or instrumentality." *NML Capital Ltd. v. Space Expl. Techs. Corp.*, No. 14-cv-2262, 2015 WL 1334291, at *5 (C.D. Cal. Mar. 6, 2015) (citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003)).

Here, Bank of Russia's core functions are predominantly governmental. As noted in the Sberbank FSIA Memo, the Bank of Russia is a crucial market regulator within the Russian System. The Constitution of the Russian Federation states that the Bank of Russia is "exclusively" responsible for the issuance of rubles, and that "protecting and ensuring the stability of the ruble shall be the core function of the Central Bank of the Russian Federation[.]" Art. 75 of the Constitution of the Russian Federation; Decl. of Lyudmila G. Efimova ¶ 6. Further, the Bank of Russia is to exercise these duties "independently from other state power bodies." *Id.* Along with its currency stabilization role, "[t]he Bank of Russia formulates economic policy in coordination with other branches of government and possesses wide regulatory authority, including the issuance of legal normative acts and the imposition of administrative fines." Sberbank FSIA Memo at 14. Its governmental functions include acting as a last-resort creditor, setting the rules to conduct banking operations, managing the gold and currency reserves of the Russian Government, regulating the Russian banking and financial sectors, setting the exchange rate of foreign currencies against the ruble, and compiling various official statistics used in the forecasting and public communication of Russian economic policy. Efimova Decl. ¶ 8. These activities are all quintessentially governmental, and in line with the work of central banks in other countries. Therefore, the Court holds that the Bank of Russia is a "political subdivision" of the Russian government.

7

SPA-8

### D.   SBERBANK IS AN AGENCY OR INSTRUMENTALITY OF RUSSIA

As discussed above, under the "core functions" test from *Garb*, the Bank of Russia is a political subdivision. Its core functions – regulating the Russian economy, maintaining the value of the Ruble, and overseeing Russian banks are predominantly governmental. Because Bank of Russia is a political subdivision of Russia, Sberbank is presumptively covered by sovereign immunity because it is majority owned by it. *See e.g., Dole Food Co. v Patrickson,* 538 U.S. 468, 477 (2003) ("A corporation is an instrumentality of a foreign state under the FSIA only if the foreign state itself owns a majority of the corporation's shares.")

Sberbank's submissions show that Sberbank is majority owned by the Bank of Russia. *See, e.g.,* Oleg Tsvetkov Decl. ¶ 3: "As of 4 April 2019 . . . the Bank of Russia (also called the Central Bank of Russia) owned a 50% plus one share stake of Sberbank's total authorized capital."). Under §1603(b)(2) of the FSIA, Sberbank is then an entity "a majority of whose shares . . . [are] owned by a foreign state or political subdivision thereof," and therefore qualifies as an agency or instrumentality of the State of Russia.

### E.   SBERBANK MAY STILL BE HELD LIABLE UNDER THE COMMERCIAL-ACTIVITY EXCEPTION TO THE FSIA

Sberbank argues that by virtue of its status as an agency or instrumentality of a foreign state, it is presumptively immune from suit. Sberbank FSIA Memo at 3. Having determined that the 1) the Bank of Russia is a political subdivision, and 2) Sberbank is an agency or instrumentality of Russia, the Court next must decide whether an exception to sovereign immunity applies to Sberbank. The Court holds that the commercial-activity exception applies in this case, and Sberbank is thus subject to suit.

8

When considering an exception to the FSIA, Plaintiff carries the burden "of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Freund v. Republic of France*, 592 F. Supp. 2d 540, 552-53 (S.D.N.Y. 2008) (quoting *Cabiri v. Republic of Ghana*, 165 F.3d 193, 196 (2d Cir. 1999)). Once Plaintiff satisfies this burden of production, the burden of persuasion passes to Defendants to show that an exception to the FSIA does not apply. *Freund*, 592 F. Supp. 2d at 552-53 (providing that "the ultimate burden of persuasion remains with the alleged foreign sovereign"); *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).

Section 1605(a)(2) of FSIA, the statute's commercial activity exception, provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case" in which the action is based upon (1) "a commercial activity carried on in the United States by the foreign state"; (2) "upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." To fall within the commercial activity exception, [Defendant's] activities need to qualify for at least one of the categories specified in the three clauses of §1605(a)(2). *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 348 (2d Cir. 2021) (hereinafter, "*Halkbank*").

As the Second Circuit stated in *Halkbank*, the commercial activity inquiry begins with identifying an act that is based upon the particular conduct that constitutes the 'gravamen' of the suit." *Id.*; *see also Barnet as Tr. Of 2012 Saretta Barnet Revocable Trust v. Ministry of Culture and Sports of the Hellenic Republic*, 961 F.3d at 200 ("We first must identify [the] predicate act that serves as the basis for plaintiff's claims.") (internal quotation marks omitted).

Plaintiffs' Second Amended Complaint ("SAC") alleges that Sberbank provided material support and financing to the DPR (SAC ¶ 79), in part by operating correspondent accounts in New York (SAC ¶¶ 58-59), and by allowing transfers to a specific Sberbank bank card (SAC ¶¶ 317, 318). The money raised through these transfers then allowed the DPR and its senior leadership to procure lethal weapons. SAC ¶¶ 293, 296-305. This conduct constitutes the "gravamen" of the allegations against Sberbank, and the conduct related to the correspondent banks in New York took place in the United States.

The FSIA provides that "the commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The Second Circuit has held that "*purpose* is the reason why the foreign state engages in the activity and *nature* is the outward form of the conduct that the foreign state performs or agrees to perform. Put another way, the issue is whether the particular actions that the foreign state performs . . . are the *type* of actions by which a private party engages in trade and traffic or commerce." *Halkbank*, 26 F.4th at 349 (other emphases and internal quotation marks omitted).

Here, Plaintiffs have alleged that Sberbank and the other defendants provided material support and financing to the DPR. SAC ¶ 79. The DPR used Defendants' services to raise money and advertised ways to donate money to accounts or bank cards associated with Defendants Sberbank and VTB Bank. SAC ¶¶ 143-150. Media outlets reported that Sberbank facilitated payments to soldiers to assist Russian Separatists in East Ukraine. SAC ¶¶ 167-169. Further, the DPR published online detailed ledgers reflecting the funds that the DPR received using Defendants' services, and the DPR also detailed how the funds were used to purchase equipment and weaponry "necessary for the DPR's terrorist activities." *Id.* at ¶¶ 179-180. A senior leader of

10

the DPR indicated that transfers could be made to a specific Sberbank bank card or via Western Union and solicited funds through transfers utilizing Sberbank and other defendants. SAC ¶¶ 317, 318. Plaintiffs also allege that prior to the attack on MH17, the DPR provided instructions on how to send transfers in U.S. Dollars to Sberbank and VTB Bank's correspondent accounts in New York. *Id.* at ¶¶ 58-59.

The use of correspondent accounts and authorization of money transfers is classic commercial behavior for an international bank and does not qualify as sovereign conduct. A bank that is acting in a commercial manner, as Sberbank is alleged to have done, is not presumptively excused from suit. As the Supreme Court has held, "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992). Therefore, the first two clauses of §1605(a)(2) are satisfied, and the defense of sovereign immunity is denied.

### F. *ALTERNATE GROUNDS OF DISMISSAL UNDER THE ATA*

As stated in the Supreme Court's decision, *Republic of Austria* v. *Altmann*, 541 U.S. 677, 691 (2004), "courts should decide claims of sovereign immunity in conformity with [FSIA's] principles." Because of this, courts have regarded "an assertion of sovereign immunity under the ATA as being functionally equivalent to an assertion of sovereign immunity under the FSIA." *Ungar v. Palestinian Liberation Org.*, 402 F.3d 274, 283 (1st Cir. 2005) (internal citation omitted); e.g., *Sokolow v. Palestine Liberation Org.*, 583 F.Supp.2d 451, 457 (S.D.N.Y. 2008) ("The ATA's exclusion, of foreign states and governmental actors from its coverage, is consistent with, and to be applied in accordance with, the ordinary sovereign immunity principles codified in the FSIA."),

**SPA-12**

*vacated on different grounds sub nom. Waldman v. Palestinian Liberation Org.*, 835 F.3d 317 (2d Cir. 2016). Sberbank's argument to read the ATA's sovereign immunity provision more broadly than the FSIA are thus counter to the practice of the federal courts. For that reason, Sberbank's motion to dismiss under the ATA's sovereign immunity provision is denied.

## IV.    CONCLUSION

For the reasons set forth above, Sberbank's second motion to dismiss is denied. The parties are to continue with discovery and proceedings before Judge Gorenstein's Chambers.

**SO ORDERED.**

**Dated:**          **New York, New York**
                **December 6, 2022**

_____
        **ANDREW L. CARTER, JR.**
        **United States District Judge**

12

SPA-13

United States Code Annotated
    Title 28. Judiciary and Judicial Procedure (Refs & Annos)
        Part IV. Jurisdiction and Venue (Refs & Annos)
            Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1603

§ 1603. Definitions

Effective: February 18, 2005
Currentness

For purposes of this chapter--

**(a)** A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

**(b)** An "agency or instrumentality of a foreign state" means any entity--

    **(1)** which is a separate legal person, corporate or otherwise, and

    **(2)** which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

    **(3)** which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

**(c)** The "United States" includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.

**(d)** A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

**(e)** A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.

**CREDIT(S)**

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892; amended Pub.L. 109-2, § 4(b)(2), Feb. 18, 2005, 119 Stat. 12.)

SPA-14

§ 1603. Definitions, 28 USCA § 1603

28 U.S.C.A. § 1603, 28 USCA § 1603
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

SPA-15

§ 1604. Immunity of a foreign state from jurisdiction, 28 USCA § 1604

United States Code Annotated
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
      Part IV. Jurisdiction and Venue (Refs & Annos)
         Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1604

§ 1604. Immunity of a foreign state from jurisdiction

Currentness

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

**CREDIT(S)**

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892.)

28 U.S.C.A. § 1604, 28 USCA § 1604
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

SPA-16

United States Code Annotated
    Title 28. Judiciary and Judicial Procedure (Refs & Annos)
        Part IV. Jurisdiction and Venue (Refs & Annos)
            Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1605

§ 1605. General exceptions to the jurisdictional immunity of a foreign state

Effective: December 16, 2016
Currentness

**(a)** A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--

**(1)** in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

**(2)** in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

**(3)** in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

**(4)** in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

**(5)** not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to--

**(A)** any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

**(B)** any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights; or

§ 1605. General exceptions to the jurisdictional immunity of a..., 28 USCA § 1605

**(6)** in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

**(b)** A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That--

**(1)** notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved; and

**(2)** notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in paragraph (1) of this subsection or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

**(c)** Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, had the vessel been privately owned and possessed, a suit in rem might have been maintained. A decree against the foreign state may include costs of the suit and, if the decree is for a money judgment, interest as ordered by the court, except that the court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose. Such value shall be determined as of the time notice is served under subsection (b)(1). Decrees shall be subject to appeal and revision as provided in other cases of admiralty and maritime jurisdiction. Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien as provided in this section.

**(d)** A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action brought to foreclose a preferred mortgage, as defined in section 31301 of title 46. Such action shall be brought, heard, and determined in accordance with the provisions of chapter 313 of title 46 and in accordance with the principles of law and rules of practice of suits in rem, whenever it appears that had the vessel been privately owned and possessed a suit in rem might have been maintained.

[**(e), (f)** Repealed. Pub.L. 110-181, Div. A, Title X, § 1083(b)(1)(B), Jan. 28, 2008, 122 Stat. 341.]

**(g) Limitation on discovery.--**

**(1) In general.--(A)** Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for section 1605A or section 1605B, the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

**(B)** A stay under this paragraph shall be in effect during the 12-month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12-month periods upon motion by the United States if the Attorney General certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

**(2) Sunset.--(A)** Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

**(B)** After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would--

**(i)** create a serious threat of death or serious bodily injury to any person;

**(ii)** adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

**(iii)** obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

**(3) Evaluation of evidence.**--The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

**(4) Bar on motions to dismiss.**--A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

**(5) Construction.**--Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.

**(h) Jurisdictional immunity for certain art exhibition activities.**--

**(1) In general.**--If--

**(A)** a work is imported into the United States from any foreign state pursuant to an agreement that provides for the temporary exhibition or display of such work entered into between a foreign state that is the owner or custodian of such work and the United States or one or more cultural or educational institutions within the United States;

**(B)** the President, or the President's designee, has determined, in accordance with subsection (a) of Public Law 89-259 (22 U.S.C. 2459(a)), that such work is of cultural significance and the temporary exhibition or display of such work is in the national interest; and

**(C)** the notice thereof has been published in accordance with subsection (a) of Public Law 89-259 (22 U.S.C. 2459(a)),

any activity in the United States of such foreign state, or of any carrier, that is associated with the temporary exhibition or display of such work shall not be considered to be commercial activity by such foreign state for purposes of subsection (a)(3).

**(2) Exceptions.--**

**(A) Nazi-era claims.--**Paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and--

(i) the property at issue is the work described in paragraph (1);

(ii) the action is based upon a claim that such work was taken in connection with the acts of a covered government during the covered period;

(iii) the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

(iv) a determination under clause (iii) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

**(B) Other culturally significant works.--**In addition to cases exempted under subparagraph (A), paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and--

(i) the property at issue is the work described in paragraph (1);

(ii) the action is based upon a claim that such work was taken in connection with the acts of a foreign government as part of a systematic campaign of coercive confiscation or misappropriation of works from members of a targeted and vulnerable group;

**(iii)** the taking occurred after 1900;

**(iv)** the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

**(v)** a determination under clause (iv) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

**(3) Definitions.**--For purposes of this subsection--

**(A)** the term "work" means a work of art or other object of cultural significance;

**(B)** the term "covered government" means--

**(i)** the Government of Germany during the covered period;

**(ii)** any government in any area in Europe that was occupied by the military forces of the Government of Germany during the covered period;

**(iii)** any government in Europe that was established with the assistance or cooperation of the Government of Germany during the covered period; and

**(iv)** any government in Europe that was an ally of the Government of Germany during the covered period; and

**(C)** the term "covered period" means the period beginning on January 30, 1933, and ending on May 8, 1945.

## CREDIT(S)

(Added Pub.L. 94-583, § 4(a), Oct. 21, 1976, 90 Stat. 2892; amended Pub.L. 100-640, § 1, Nov. 9, 1988, 102 Stat. 3333; Pub.L. 100-669, § 2, Nov. 16, 1988, 102 Stat. 3969; Pub.L. 101-650, Title III, § 325(b)(8), Dec. 1, 1990, 104 Stat. 5121; Pub.L. 104-132, Title II, § 221(a), Apr. 24, 1996, 110 Stat. 1241; Pub.L. 105-11, Apr. 25, 1997, 111 Stat. 22; Pub.L. 107-77, Title VI, § 626(c), Nov. 28, 2001, 115 Stat. 803; Pub.L. 107-117, Div. B, § 208, Jan. 10, 2002, 115 Stat. 2299; Pub.L. 109-304, § 17(f) (2), Oct. 6, 2006, 120 Stat. 1708; Pub.L. 110-181, Title X, § 1083(b)(1), Jan. 28, 2008, 122 Stat. 341; Pub.L. 114-222, § 3(b) (2), Sept. 28, 2016, 130 Stat. 853; Pub.L. 114-319, § 2(a), Dec. 16, 2016, 130 Stat. 1618.)

28 U.S.C.A. § 1605, 28 USCA § 1605
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**SPA-21**

---

> United States Code Annotated
>> Title 28. Judiciary and Judicial Procedure (Refs & Annos)
>>> Part IV. Jurisdiction and Venue (Refs & Annos)
>>>> Chapter 97. Jurisdictional Immunities of Foreign States

28 U.S.C.A. § 1605B

§ 1605B. Responsibility of foreign states for international terrorism against the United States

Effective: September 28, 2016
Currentness

**(a) Definition.**--In this section, the term "international terrorism"--

    **(1)** has the meaning given the term in section 2331 of title 18, United States Code; and

    **(2)** does not include any act of war (as defined in that section).

**(b) Responsibility of foreign states.**--A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by--

    **(1)** an act of international terrorism in the United States; and

    **(2)** a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

**(c) Claims by nationals of the United States.**--Notwithstanding section 2337(2) of title 18, a national of the United States may bring a claim against a foreign state in accordance with section 2333 of that title if the foreign state would not be immune under subsection (b).

**(d) Rule of construction.**--A foreign state shall not be subject to the jurisdiction of the courts of the United States under subsection (b) on the basis of an omission or a tortious act or acts that constitute mere negligence.

**CREDIT(S)**

    (Added Pub.L. 114-222, § 3(a), Sept. 28, 2016, 130 Stat. 853.)

28 U.S.C.A. § 1605B, 28 USCA § 1605B
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

§ 1605B. Responsibility of foreign states for international..., 28 USCA § 1605B

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

SPA-23

§ 2333. Civil remedies, 18 USCA § 2333

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 113B. Terrorism (Refs & Annos)

18 U.S.C.A. § 2333

§ 2333. Civil remedies

Effective: October 3, 2018
Currentness

**(a) Action and jurisdiction.--**Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

**(b) Estoppel under United States law.--**A final judgment or decree rendered in favor of the United States in any criminal proceeding under section 1116, 1201, 1203, or 2332 of this title or section 46314, 46502, 46505, or 46506 of title 49 shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

**(c) Estoppel under foreign law.--**A final judgment or decree rendered in favor of any foreign state in any criminal proceeding shall, to the extent that such judgment or decree may be accorded full faith and credit under the law of the United States, estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

**(d) Liability.--**

　**(1) Definition.--**In this subsection, the term "person" has the meaning given the term in section 1 of title 1.

　**(2) Liability.--**In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

**(e) Use of blocked assets to satisfy judgments of U.S. nationals.--**For purposes of section 201 of the Terrorism Risk Insurance Act of 2002 (28 U.S.C. 1610 note), in any action in which a national of the United States has obtained a judgment against a terrorist party pursuant to this section, the term "blocked asset" shall include any asset of that terrorist party (including the blocked assets of any agency or instrumentality of that party) seized or frozen by the United States under section 805(b) of the Foreign Narcotics Kingpin Designation Act (21 U.S.C. 1904(b)).

**CREDIT(S)**

SPA-24

§ 2333. Civil remedies, 18 USCA § 2333

   (Added Pub.L. 102-572, Title X, § 1003(a)(4), Oct. 29, 1992, 106 Stat. 4522; amended Pub.L. 103-429, § 2(1), Oct. 31, 1994, 108 Stat. 4377; Pub.L. 114-222, § 4(a), Sept. 28, 2016, 130 Stat. 854; Pub.L. 115-253, § 3(a), Oct. 3, 2018, 132 Stat. 3183.)

18 U.S.C.A. § 2333, 18 USCA § 2333
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    2

SPA-25

§ 2337. Suits against Government officials, 18 USCA § 2337

---

> United States Code Annotated
>   Title 18. Crimes and Criminal Procedure (Refs & Annos)
>     Part I. Crimes (Refs & Annos)
>       Chapter 113B. Terrorism (Refs & Annos)

18 U.S.C.A. § 2337

§ 2337. Suits against Government officials

Currentness

No action shall be maintained under section 2333 of this title against--

**(1)** the United States, an agency of the United States, or an officer or employee of the United States or any agency thereof acting within his or her official capacity or under color of legal authority; or

**(2)** a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof acting within his or her official capacity or under color of legal authority.

**CREDIT(S)**

(Added Pub.L. 102-572, Title X, § 1003(a)(4), Oct. 29, 1992, 106 Stat. 4523.)

18 U.S.C.A. § 2337, 18 USCA § 2337
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.