# 22-3097-cv

## United States Court of Appeals
### for the
## Second Circuit

THOMAS SCHANSMAN, individually, as surviving parent of Quinn Lucas
Schansman, and as the as legal guardian on behalf of X.S., a minor.,
CATHARINA TEUNISSEN, individually and as the surviving parent and
personal representative of the Estate of QUINN LUCAS SCHANSMAN,
NERISSA SCHANSMAN, as surviving sibling of Quinn Lucas Schansman,
XANDER SCHANSMAN, individually, as a surviving Sibling of
Quinn Lucas Schansman,

*Plaintiffs-Appellees,*

– v. –

SBERBANK OF RUSSIA PJSC,

*Defendant-Appellant,*

WESTERN UNION COMPANY, WESTERN UNION FINANCIAL SERVICES,
INC., MONEYGRAM INTERNATIONAL, INC, MONEYGRAM PAYMENT
SYSTEMS, INC., VTB BANK PJSC,

*Defendants.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT

NATALIE SHKOLNIK
JAY S. AUSLANDER
MICHAEL VAN RIPER
WILK AUSLANDER LLP
*Attorneys for Defendant-Appellant*
825 Eighth Avenue, Suite 2900
New York, New York 10019
(212) 981-2300

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................1

I.   SBERBANK IS PRESUMPTIVELY IMMUNE UNDER THE FSIA ........1

    A.   Foreign State Immunity Attaches When a Private Entity Becomes
a State-Owned "Agency or Instrumentality" After Filing ...................2

        1.   Plaintiffs Misread Dole and this Court's Precedent .....................2

        2.   The Text and Purpose of the FSIA Require the Courts to
Grant Presumptive Immunity When a Private Entity
Becomes State-Owned .................................................................6

    B.   Even if Dole Barred Post-Filing Immunity, the District Court
Correctly Applied this Court's Core Functions Test to Determine
that Sberbank Was Presumptively Immune at the Time of Filing
Under the Majority Ownership of the Central Bank ............................9

II.  SBERBANK IS ALSO PRESUMPTIVELY IMMUNE UNDER
THE ATA ...................................................................................................14

    A.   Section 2337 of the ATA Employs the Same Definition of
"Foreign State" as the FSIA ..............................................................14

    B.   Even If the Definition of "Foreign State" Under the ATA Does
Not Include Agencies or Instrumentalities, Sberbank Would Be
Presumptively Immune Under Section 2337 as an "Agency" of
a Foreign State ...................................................................................17

III. THE COMMERCIAL ACTIVITY EXCEPTION CANNOT APPLY
UNDER THE ATA AND DOES NOT APPLY UNDER THE FSIA ........19

    A.   The Only Exception to Sovereign Immunity Under the ATA Is
the JASTA Exception: Injuries Caused By Terror Attacks Within
The United States ...............................................................................19

    B.   Even if the FSIA's Commercial Activity Exception Could Pierce
Sovereign Immunity Under the ATA, the Exception Does Not
Apply ..................................................................................................21

    C.   Further Jurisdictional Discovery is Improper in the Absence of a
Cross-Appeal ......................................................................................26

IV.  SBERBANK DID NOT WAIVE OR FORFEIT ITS SOVEREIGN
IMMUNITY NOR ANY ARGUMENT IN SUPPORT OF IT .................27

CONCLUSION ........................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abrams v. Societe Nationale Des Chemins De Fer Francais*,
389 F.3d 61 (2d Cir. 2004)..................................................................3, 4

*Azar v. Allina Health Servs.*,
139 S. Ct. 1804 (2019) ........................................................................16

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) ..............................................................24

*Cargill Int'l S.A. v. M/T Pavel Dybenko*,
991 F.2d 1012 (2d Cir.1993)..............................................................27

*Caterpillar Inc. v. Lewis*,
519 U.S. 61 (1996)................................................................................3

*Doe v. Bin Laden*,
663 F.3d 64 (2011) ....................................................................... 20, 21

*Dole Food v. Patrickson*,
538 U.S. 468 (2003)...................................................................... passim

*Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*,
12 F.3d 317 (2d Cir. 1993)..................................................................28

*European Community v. RJR Nabisco, Inc.*,
764 F.3d 129 (2d Cir. 2014)..................................................................3

*Garb v. Republic of Poland*,
440 F.3d 579 (2d Cir. 2006)............................................................1, 11

*In re Johns-Manville Corp.*,
476 F.3d 118 (2d Cir. 2007)................................................................27

*In re Terrorist Attacks on Sept. 11,
2001*, 714 F.3d 109 (2d Cir. 2013) .....................................................27

*Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*,
38 F.3d 1279 (2d Cir. 1994)................................................................27

iii

*Lawton v. Republic of Iraq*,
581 F. Supp. 2d 43 (D.D.C. 2008) .......................................................20

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013) ..................................................24

*Licci v. Lebanese Canadian Bank*,
20 N.Y.3d 327 (2012) ........................................................24

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) .................................................25

*OBB Personenverkehr AG v. Sachs*,
577 U.S. 27 (2015) ...................................................... 21, 22

*Patrickson v. Dole Food Co.*,
251 F.3d 795 (9th Cir. 2001) ...................................................2

*Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992) ..................................................... 12, 14

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004) .................................................... 3, 7, 8

*Rodriguez v. Pan American Health Organization*,
29 F.4th 706 (D.C. Cir. 2022) ................................................23

*Smith ex rel. Smith v. Islamic Emirate of Afghanistan*,
262 F. Supp. 2d 217 (S.D.N.Y. 2003) .......................................19

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
30 F.3d 148 (D.C. Cir. 1994) .......................................... 12, 14

*Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*,
204 F.3d 384 (2d Cir. 2000)..................................................22

*Turkiye Halk Bankasi A.S. v. United States*,
143 S. Ct. 940 (2023) ............................................ 5, 11, 18, 19

*Ungar v. Palestine Liberation Org.*,
402 F.3d 274 (1st Cir. 2005) ................................................14

*United States v. Olano*,
  507 U.S. 725 (1993) ............................................................28

*Verlinden BV v. Central Bank of Nigeria*,
  461 U.S. 480 (1983) ..............................................................8

*Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*,
  707 F.2d 680 (2d Cir. 1983) ...............................................28

*Weiss v. Nat'l Westminster Bank, PLC*,
  993 F.3d 144 (2d Cir. 2021) ...............................................24

*Wolf v. Banco Nacional de Mexico, S.A.*,
  739 F.2d 1458 (9th Cir. 1984) ..............................................8

*Wultz v. Islamic Republic of Iran*,
  755 F. Supp. 2d 1 (D.D.C. 2010) ........................................25

## Statutes

18 U.S.C. § 1589(b) ..................................................................23

18 U.S.C. § 2331 ......................................................................24

18 U.S.C. § 2333 ......................................................................26

18 U.S.C. § 2337 ......................................................... 7, 18, 20

28 U.S.C. § 1330 ......................................................................17

28 U.S.C. § 1603 ..................................................................7, 15

28 U.S.C. § 1604 ........................................................................6

28 U.S.C. § 1605(a)(2) .............................................................21

28 U.S.C. 1332(A)(4) ................................................................3

Pub. L. 94–583 ........................................................................17

## Other Authorities

S. REP. NO. 102-342 ...............................................................20

## INTRODUCTION

The district court erroneously denied Sberbank of Russia PJSC's ("Sberbank") motion to dismiss because—although the court correctly determined that Sberbank is presumptively immune from suit under the Foreign Sovereign Immunities Act ("FSIA") and, by extension, the Anti-Terrorism Act ("ATA")—it incorrectly determined that the FSIA's commercial activity exception also applies under the ATA and that Plaintiffs' suit falls within the scope of that exception.

This Court should therefore reverse and remand with instructions to dismiss this matter with prejudice.

## ARGUMENT

## I. SBERBANK IS PRESUMPTIVELY IMMUNE UNDER THE FSIA

Plaintiffs' argument that Sberbank is not presumptively immune under the FSIA (and therefore cannot be immune under the ATA) rests on a fundamental misreading of *Dole Food v. Patrickson*, 538 U.S. 468 (2003) and this Court's precedent, neither of which bars post-filing assertions of sovereign immunity.

Even if Plaintiffs were right about *Dole*, however, the district court's determination that Sberbank was presumptively immune at the time-of-filing under the ownership of the Central Bank is correct because the Central Bank's core functions are predominantly "governmental, rather than commercial." *See Garb v. Republic of Poland*, 440 F.3d 579, 582 (2d Cir. 2006).

**A.**     **Foreign State Immunity Attaches When a Private Entity Becomes a State-Owned "Agency or Instrumentality" After Filing**

*1.*     *Plaintiffs Misread Dole and this Court's Precedent*

Plaintiffs confidently maintain that *Dole* requires immunity to be assessed at the time of filing and *only* at the time of filing.  (Resp. Br. 21).  That confidence is misplaced: *Dole* does not so hold, and neither do this Court's prior decisions.

Rather, *Dole*, 538 U.S. at 478, holds only that—as between the time of wrongdoing and the time of filing—the time of filing controls for purposes of removal jurisdiction.  That was the "second question" before the *Dole* Court: "whether a corporation's instrumentality status is defined [i] as of the time an alleged tort or other actionable wrong occurred or, [ii] on the other hand, at the time suit is filed."  *Id*. at 471.  *Dole* therefore says nothing about the jurisdictional effect of post-filing changes in the ownership of a putative "agency or instrumentality"; it did not consider that possibility at all.

Indeed, the *Dole* Court *could not* have considered post-filing events, because the putative sovereign defendants in that case could not claim post-filing immunity, "indirectly or otherwise."  *Patrickson v. Dole Food Co.*, 251 F.3d 795, 805 (9th Cir. 2001).  Rather, "by the time [the] suit was filed in 1997, the [Israeli] government no longer owned" a majority stake in the defendant companies, leaving defendants with no basis to argue that a post-filing change in ownership might confer immunity.  *Id*.

*Republic of Austria v. Altmann*, 541 U.S. 677, 698 (2004) confirms that *Dole* considered only the two alternatives before it, carefully stating that instrumentality status under *Dole* "depends on the relationship between the entity and the state [i] at the time suit is brought rather than [ii] when the conduct occurred."

This Court's subsequent decisions, moreover, are not to the contrary. Plaintiffs rely on a single footnote from *European Community v. RJR Nabisco, Inc.*, 764 F.3d 129, 143 (2d Cir. 2014), which stated that "instrumentality status" is "determined at the time when the complaint is filed." (Resp. Br. 23). Even setting aside whether one can draw a definitive answer to such a complex question from a footnote in a case that was later reversed, *see* 579 U.S. 325 (2016), *European Community* cannot control because no party actually claimed *immunity* in that case. Rather, the question was whether complete diversity existed under 28 U.S.C. 1332(A)(4). *European Community*, 764 F.3d at 143. That is indeed the chief context in which the time of filing controls—though even there the rule has its exceptions. *See Caterpillar Inc. v. Lewis*, 519 U.S. 61, 64 (1996).

Similarly, *Abrams v. Societe Nationale Des Chemins De Fer Francais*, 389 F.3d 61, 64 (2d Cir. 2004) includes a lonely supporting parenthetical observing that *Dole* held "unequivocally" that "an entity's status as an instrumentality of a foreign state should be 'determined at the time of the filing of the complaint.'" Setting aside whether one can draw a definitive answer to such a complex question from a "see

also" parenthetical, the problem with *Abrams* is that—again, as in *Dole* itself—the effect of post-filing changes in ownership was simply not at issue. The retroactivity of the FSIA after *Altmann* was the issue. *Id*. at 63-64.

In the pending matter of *Bartlett v. Société Générale De Banque Au Liban SAL*, No. 21-2019 (2d Cir.) ("*Bartlett*"), however, the temporal scope of *Dole* and the effect of post-filing changes on immunity is squarely at issue. On March 8, 2023, just after oral argument, the *Bartlett* panel made that clear, inviting the views of the State Department on the following question: "whether the time-of-filing rule from *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), precludes a post-filing claim of sovereign immunity under the [FSIA] . . . ." (Order, *Bartlett* ECF No. 112). That order suggests that the *Bartlett* panel does not believe that *Dole* itself provides the answer; moreover, it strongly suggests that the *Bartlett* court will address the scope of the time-of-filing rule in its upcoming decision.[1]

For its part, the State Department—which is in a better position to know than most—concluded that this is a "complex question of statutory interpretation. . . not one that the courts of appeals have addressed in any detail." (Yelin Aff. ¶ 3, *Bartlett* ECF No. 121). In its subsequent brief to the *Bartlett* panel (the "State Department

---

[1] In *Bartlett*, counsel for Sberbank supported and helped draft an amicus submission by Professor Joseph W. Dellapenna supporting its interpretation of *Dole* (the "Dellapenna Brief") (*Bartlett* ECF No. 147). The *Bartlett* panel accepted the Dellapenna Brief for filing by Order dated July 5, 2023. (*Bartlett* ECF No. 146).

Brief") (*Bartlett* ECF No. 133), the State Department then rejected the theory that *Dole* controls the outcome: "In the view of the United States, if [] a defendant becomes an agency or instrumentality of a foreign state within the meaning of the FSIA . . . it is entitled to immunity from suit under the FSIA, subject to the exceptions enumerated by that statute; *Dole Food* is not to the contrary."  (State Dep't Br. 1).[2]

Just last term, the Supreme Court "admonished" parties grappling with the complexities of the FSIA to remember that: "[G]eneral language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering."  *Turkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940, 950 (2023) (citations and internal quotation marks omitted).  That is Plaintiffs' error here: the effect of post-filing changes in ownership is *not* an issue resolved by *Dole*, nor one this Court has addressed in any detail, not in *European Community*, not in *Abrams*, and not elsewhere.

---

[2] Professor Dellapenna concurred: "The time-of-filing rule in *Dole Food* does not and should not present any bar to a defendant that . . . seeks immunity under the Foreign Sovereign Immunities Act when it becomes an 'agency or instrumentality' and therefore a 'foreign state' under the Foreign Sovereign Immunities Act after filing, but before judgment."  (Dellapenna Br. 29).

2. *The Text and Purpose of the FSIA Require the Courts to Grant Presumptive Immunity When a Private Entity Becomes State-Owned*

*Dole's* time-of-filing rule does not bar post-filing assertions of presumptive immunity under the FSIA (nor, by extension, the ATA). Nor should it, for four reasons:

<u>First</u>, the question in *Dole* was how and when to fix instrumentality status for purposes of establishing jurisdiction under the FSIA's removal provision. 538 U.S. at 478 ("*To be entitled to removal under § 1441(d)*, [defendants] must show that they are entities 'a majority of whose shares or other ownership interest is owned by a foreign state.'") (emphasis added). It was therefore reasonable for *Dole* to draw on the existing rules governing removal jurisdiction in diversity cases, *id*. at 478, but it is not reasonable to uncritically apply those rules to post-filing changes in ownership or infer that the Supreme Court would have rejected post-filing immunity if confronted with that issue. This Court must instead look to the text and purposes of the FSIA.

<u>Second</u>, turning to the text, the existence of immunity under the FSIA and the definitions of "foreign state" and "agency or instrumentality" are expressed with a mix of the future continuous tense ("shall be") and present tense ("is"), not the past tense ("was") or past perfect ("had been"). 28 U.S.C. §§ 1603, 1604. As Section 1604 states: "a foreign state *shall be* immune from the jurisdiction of the courts. . . ."

Section 1603, moreover, defines "agency or instrumentality" exclusively in the present tense: "A 'foreign state' . . . includes . . . an agency or instrumentality of a foreign state [and] [a]n 'agency or instrumentality of a foreign state' means any entity which *is* a separate legal person . . . [and] which *is* an organ of a foreign state . . . and which *is* neither a citizen of a State of the United States . . . nor created under the laws of any third country."  (emphasis added).  The same is true of the ATA's immunity provision, which provides that no action "shall be maintained" against a sovereign defendant.  18 U.S.C. § 2337.

This mix of tenses demonstrates that the FSIA and ATA protect foreign states not only at the time of filing, but on a present basis—as in now, this present moment. *See Dole*, 538 U.S. at 478.  Ironically, *Dole* itself made that interpretive point when choosing between pre-filing conduct and the time-of-filing, explaining that the FSIA's use of the present tense must carry "real significance."[3]  *Id*.

Third, consistent with that text, "foreign sovereign immunity's principal purpose is to give foreign states and their instrumentalities some *present* protection from the inconvenience of suit." *Altmann*, 541 U.S. at 678 (quoting *Dole*, 538 U.S.

---

[3]  Again, the State Department: "*Dole Food's* central interpretive holding is that courts must give effect to § 1603(b)'s use of the present tense. When an entity acquires instrumentality status during a suit against it, giving the present tense real significance requires recognizing the entity's claim to foreign sovereign immunity under the FSIA."  (State Dep't Br. 13); (*See also* Dellapenna Br. 24, 28).

at 479). By permanently fixing immunity at the time-of-filing—that is, in the past—the courts would frustrate that purpose, not vindicate it.

Fourth, another of the FSIA's central purposes was to codify the existing restrictive theory of sovereign immunity, which included both a jurisdictional and substantive component: "the FSIA is not simply a jurisdictional statute, but a codification of 'the standards governing foreign sovereign immunity as an aspect of *substantive* federal law.'" *Altmann*, 541 U.S. at, 678 (quoting *Verlinden BV v. Central Bank of Nigeria,* 461 U.S. 480, 496-497 (1983)). Even where removal jurisdiction was proper at the time of filing under *Dole*, the courts should continue to apply this substantive component of immunity by abjuring jurisdiction when an entity becomes immune after filing.[4] *See, e.g., Wolf v. Banco Nacional de Mexico, S.A.,* 739 F.2d 1458 (9th Cir. 1984) (extending presumptive immunity to a bank nationalized by Mexico post-filing).

Plaintiffs counter all of this by raising the specter of manipulation—that foreign states might meddle with jurisdiction by nationalizing private companies after filing. (Resp. Br. 17). As the State Department explained, however, that risk is

---

[4] The State Department agrees here too: "Because the FSIA's substantive foreign sovereign immunity principles apply independently of the statute's grant of jurisdiction, an entity that acquires instrumentality status during litigation is entitled to claim immunity under the FSIA[.]" (State Dep't Br. 17); (*See also* Dellapenna Br. 28).

illusory: "The United States is aware of no case in which a foreign state has made an entity an agency or instrumentality in order to manipulate the courts' ability to adjudicate a suit against the entity." (State Dep't Br. 20).

Yet even if potential manipulation might give this Court pause in principle, this is hardly the case to worry about it in fact. *Schansman* is an important and tragic case, but it nevertheless beggars belief that Sberbank—an entity with hundreds of thousands of private shareholders (A.198)—would arrange for the Government of Russia to acquire it through the Ministry of Finance simply to shore up its already compelling immunity defense, even while it still had an unresolved motion to dismiss before the district court. (*See* ECF Nos. 114, 153).

Plaintiffs also counter that "continuous" assessment of immunity would burden the courts (Resp. Br. 17), but this concern is likewise illusory because a putative sovereign defendant will still need to move the court upon a jurisdictionally significant change in ownership.

### B. Even if *Dole* Barred Post-Filing Immunity, the District Court Correctly Applied this Court's Core Functions Test to Determine that Sberbank Was Presumptively Immune at the Time of Filing Under the Majority Ownership of the Central Bank

The district court adopted Plaintiffs' flawed categorical reading of *Dole*, determining that it must assess Sberbank's status as a state-owned agency or instrumentality under the FSIA and ATA only at the time of filing, when the Central Bank owned a majority stake in Sberbank. (SPA 5).

The district court then determined, however, that Sberbank is indeed presumptively immune. The district court reasoned, correctly, that a corporation owned by the "foreign state" itself or its "political subdivisions" (as opposed to another "agency or instrumentality") is entitled to immunity. (SPA 6). Finding that the Central Bank is a "political subdivision" of the Russian Federation, the district court therefore extended presumptive immunity to Sberbank. (SPA 8).

Invoking the rule that this Court may affirm for any basis appearing in the record, Plaintiffs challenge the district court's finding that the Central Bank is a political subdivision of the Russian Federation. (Resp. Br. 27 n. 10). Plaintiffs come up short, however.

First and foremost, Plaintiffs entire argument depends on their flawed interpretation of *Dole*. If the FSIA permits a private entity to invoke immunity when it becomes state-owned after filing or upon the filing of an amended complaint— and it does, in full consistency with *Dole*—then Sberbank became presumptively immune upon its majority acquisition by the Ministry of Finance (which no party doubts is part of the Russian state itself).

Second, the district court was correct when it found that the Central Bank is a political subdivision.

Preliminarily, the district court is entitled to deference on this ruling because Plaintiffs' challenge amounts to an attack on its fact-finding, not merely its legal

conclusions. Although the Court's ultimate determination of immunity is subject to *de novo* review, when the court makes findings of fact along the way, this Court "review[s] . . . its factual determinations for clear error." *Turkiye Halk Bankasi*, 16 F.4th at 345.

Here, Plaintiffs reach deep into the voluminous record below, purporting to emphasize the (cherry-picked) testimony of Sberbank's expert, but also relying at length on an evidentiary source that they merely link by PDF: the Central Bank's annual 2020 report. (Resp. Br. 32). The district court rightly ignored this source in its opinion. (*See* SPA 7). By insisting that this Court both give it undue weight and reassess the expert testimony, Plaintiffs challenge the district court's review of the sources and its fact-finding, not merely its legal conclusion the Central Bank is a political subdivision of the Russian state.

That legal conclusion derives from the core functions test, which this Court set forth in *Garb*, 440 F.3d at 593-94. The test distinguishes mere "agencies or instrumentalities" from "foreign states" and their "political subdivisions" by asking whether an entity's "core functions" are "predominantly . . . commercial" (in which case the entity is a mere agency or instrumentality) or "predominantly governmental" (in which case the entity is part of the foreign state itself, or one of its political subdivisions). *Id*. at 591-92. Of the four cases Plaintiffs cite for the "recogni[tion] that the core of a foreign central bank's activities is predominantly

commercial," (Resp. Br. 27), zero actually assess whether a central bank is a political subdivision or apply this core functions test. They are no more persuasive than would be *Bank Markazi v. Peterson*, 578 U.S. 212, 235-36 (2016), if Sberbank cited it for the proposition that the Supreme Court treated the Central Bank of Iran as a "foreign state," not a mere agency or instrumentality.

Drawing on the FSIA's definition of "commercial activity," Plaintiffs insist that, in applying *Garb*, this Court must look to the "nature" of the Central Bank's acts rather than their "purpose." (Resp. Br. 30). Plaintiffs purport to root this interpretive framework in *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148 (D.C. Cir. 1994). But this is a dicey extrapolation of *Transaero* at best, which says nothing about this distinction between nature and purpose (indeed, the very word "nature" appears only in its dissent). *Id*. at 155.

Plaintiffs, moreover, leave a telling lacuna in their analysis of "nature" here, relying on *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) to explain the distinction between "nature" and "purpose," but ignoring *Weltover's* very particular definition of "commercial": "[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Id*. at 614.

Fully understood, then, Plaintiffs' emphasis on nature over purpose supports the district court's conclusion. The Central Bank's core functions are

predominantly—overwhelmingly—governmental, because those functions include sweeping regulatory powers and duties well outside the activities of even the largest private players in the marketplace. Plaintiffs can only argue otherwise by ignoring the evidence of both their own and Sberbank's experts.

Here is some of what Plaintiffs overlook from the report and testimony of Sberbank's expert, Professor Efimova: (i) *by law*, the core function of the Central Bank is protecting and ensuring the stability of the ruble, (Efimova Decl. ¶ 6, ECF No. 260); (ii) the Bank exclusively issues currency ("monetary emission") to support the ruble, (*Id.* ¶¶ 6, 8); (iii) the Bank is charged with developing the National Payment System, (*Id.* ¶ 7); and (iv) the Bank wields extensive regulatory and rule-making powers, including rules for registration and licensing and the power to impose administrative liability, (*Id.* ¶ 43).

Here is some of what Plaintiffs overlook from the report and testimony of their own expert, Professor Butler: (i) either "a" or "the" principal function of the Central Bank "is to defend the ruble"—an agreement among the two experts that, despite the Professor's hair-splitting over the definite article, should alone resolve the core functions test in Sberbank's favor, (Butler Decl. ¶¶ 6-7, ECF No. 305); (ii) the Central Bank engages in private transactions, but also exercises regulatory functions, (*Id.* ¶ 4); and (iii) *by law*, profit-making is "*not* a purpose of the Central Bank," (*Id.* ¶ 12) (emphasis added), rather, its "private law dimension" (read: commercial) is

only necessary to "effectively perform its public law functions" (read: governmental), (*Id*. ¶ 27).

Should the Court even wish to rely upon it (the district court did not), Plaintiffs also overlook key portions of the Central Bank's 2020 annual report, including that the Bank ensures price stability (*Id*. at 82), financial market resilience (*Id*. at 89), and consumer financial protection (*Id*. at 169), and that it developed the Russian National Payments System (*Id*. at 195).

All of these functions—including the Bank's core function, stabilizing the ruble—are governmental: they are the powers and acts of a regulator in the market, not a private participant in it. *Weltover*, 504 U.S. at 614. The Central Bank is a "political subdivision" under the FSIA, and Sberbank was an "agency or instrumentality" while under its majority ownership.

## II. SBERBANK IS ALSO PRESUMPTIVELY IMMUNE UNDER THE ATA

### A. Section 2337 of the ATA Employs the Same Definition of "Foreign State" as the FSIA

As part of the same statutory scheme, terms in the ATA and FSIA should be read *in pari materia*—that is, the term "foreign state" in the ATA should be construed to have the same meaning as under the FSIA, and vice versa. *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 282 (1st Cir. 2005).

Plaintiffs respond to *Ungar's* conclusion by quoting and then promptly ignoring it. (Resp. Br. 52). Rather, Plaintiffs argue that the absence of the term "instrumentality" from Section 2337 eliminates the possibility that Sberbank is presumptively immune under that provision. (*Id*. at 35).

This misses the import of *in pari materia* construction entirely. The FSIA employs a technical definition of "foreign state" that "includes" not just foreign states *qua* foreign states (as Plaintiffs would read the ATA), but also their "organs," "political subdivisions," and "agencies or instrumentalities." 28 U.S.C. § 1603. If *Ungar* is correct that the ATA's definition of foreign state uses the same definition as the FSIA, then the ATA necessarily imports the terms "organs," "political subdivisions," and "agencies or instrumentalities."

Relying on *Ungar*, the State Department in *Bartlett* likewise urges a consistent construction of the ATA's and FSIA's presumptive immunity provisions: "Courts have construed an assertion of immunity under § 2337(2) as 'functionally equivalent' to an assertion of immunity under the FSIA. Section 2337(2) therefore supports a construction of the FSIA that entitles an entity that acquires instrumentality status during litigation to assert immunity." (State Dep't Br. 15).

The textual links between the FSIA, JASTA, and the ATA also support the First Circuit's conclusion in *Ungar*:

JASTA amends the FSIA, and does so while using the term "foreign state." JASTA, as part of the FSIA, must therefore use that same technical definition of "foreign state." (*See* Sberbank Br. 24-25).

JASTA *also* amends the ATA, cross-referencing and partially abrogating its immunity provision, Section 2337, while again using the term "foreign state." JASTA and the ATA, therefore, *also* ought to use that same technical definition of "foreign state." (*See id*. at 25).

Although there are multiple moving parts here, the consistent interpretation of "foreign state" across the interlinked provisions of the FSIA, JASTA, and the ATA is ultimately a straightforward application of the canon that identical terms should carry the same meaning in the same statute and in an overall statutory scheme. *See, e.g., Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019). "Foreign state" in the FSIA equals "foreign state" in JASTA equals "foreign state" in the ATA.

Plaintiffs respond that this approach would leave "agency" of a foreign state under Section 2337 as mere surplusage. Not so. Because "agency or instrumentality" under the FSIA has a technical definition, it is not at all difficult to conceive a plausible definition of "agency" under the ATA that adds to that definition: indeed, Plaintiffs do exactly that in their response brief. (Resp. Br. 29). According to Plaintiffs, an "agency" under the ATA includes a "governmental corporation," "created and participated in by the [state] for the achievement of

16

governmental objectives" (*Id.*)—but not necessarily owned by the state. Right or wrong, this proposed definition of "agency" under the ATA shows that the term may be read differently from—and thus not surplus to—the FSIA's definition of "agency or instrumentality."

Plaintiffs also maintain that Congress consistently makes explicit when it intends that the FSIA's definitions apply to another statute, offering 28 U.S.C. § 1330 as an example. The problem with that example is that Section 1330 does *not* come from a different statute: though codified out of sequence, it is part of the original FSIA itself, specifically Section 2(a). *See* Pub. L. 94–583, § 2(a).

## B. Even If the Definition of "Foreign State" Under the ATA Does Not Include Agencies or Instrumentalities, Sberbank Would Be Presumptively Immune Under Section 2337 as an "Agency" of a Foreign State

Plaintiffs next address Sberbank's alternative argument that—if the ATA does not employ the same definition of foreign states as the FSIA (and it does)—then the Court should construe the term "agency" of a foreign state consistent with the definition of "agency of the United States."

Plaintiffs first state that this definition of "agency of the United States" "facially excludes" foreign states. (Resp. Br. 38). But this flatly misconstrues the argument, which is that the Court should consistently construe these two side-by-side immunity provisions of the ATA, one of which provides immunity for the United States and its agencies, one of which provides immunity for foreign states

and their agencies. (Sberbank Br. 30). Both provisions are identical, except in their respective use of "United States" and "foreign state." *Compare* 18 U.S.C. § 2337(1) *with* 18 U.S.C. § 2337(2). The point, then, is not that "agency of the United States" includes agencies of foreign states generally or Russia in particular (how could it?); the point is that courts harmoniously construe statutory terms to ensure consistent meanings. *Turkiye Halk Bankasi*, 143 S. Ct. at 948 ("[T]his Court has a duty to construe statutes, not isolated provisions.")

On that fundamental point, Plaintiffs have little to say, instead urging the court to limit the definition of "agency" of the United States—which includes corporations in which it has a "proprietary interest"—to "governmental corporations," not corporations where that proprietary interest is "custodial or incidental." (Resp. Br. 39). But the cases Plaintiffs cite in support do not *restrict* the definition of agency to such corporations, they merely bring such corporations within its ambit. And whatever "custodial or incidental" might mean in other contexts, it surely does not encompass a corporation majority owned by the United States, or in this instance a foreign state.

Plaintiffs' reliance on *Matar* and *Filler* (Resp. Br. 39-40) repeats the same mistakes they make with *Dole* and *Abrams*, lifting a pair of quotes from these two decisions that use the word "instrumentality" without using the corresponding word "agency," then pretending that the finer distinction between an "agency" and

"instrumentality" was actually at issue in those cases (it wasn't) and that they "clarif[y]" that a state-owned enterprise can only be an "instrumentality," never an "agency" (they don't).

## III. THE COMMERCIAL ACTIVITY EXCEPTION *CANNOT* APPLY UNDER THE ATA AND *DOES NOT* APPLY UNDER THE FSIA

### A. The Only Exception to Sovereign Immunity Under the ATA Is the JASTA Exception: Injuries Caused By Terror Attacks Within The United States

Plaintiffs' principal response to Sberbank's argument that JASTA provides the only exception under the ATA is that Section 1605 of the FSIA applies "in any case." (Resp. Br. 42). *Turkiye Halk Bankasi*, 143 S. Ct. at 949, however, made clear that "any case" does not actually mean "any case" where a separate provision furnishes jurisdiction (specifically criminal jurisdiction).

In addition to scolding defendant for taking its previous decisions out of context, the Supreme Court also placed those decisions *in* context, explaining that: "*Amerada Hess* made clear that the FSIA displaces general 'grants of subject-matter jurisdiction in Title 28'—that is, in civil cases against foreign states." (emphasis added). *Id*. at 950. That recapitulation forecloses Plaintiffs' uncritical reliance on the FSIA's use of the term "in any case," because the ATA's immunity provision is not a general *grant* of civil jurisdiction: it is a claim-specific *limitation* of it. *See Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 225

(S.D.N.Y. 2003) ("18 U.S.C. § 2337 appears to expressly foreclose an [ATA] action against [the foreign state] and its leader.")

The question here, in other words, is not whether the FSIA's jurisdictional exceptions apply *in this case*. The question is whether they apply *to these claims*: that is, Plaintiffs' twin claims under the ATA. Under Section 2337, they do not, because no claim under the ATA "shall be maintained" against foreign states. Until JASTA, moreover, that separate limitation was never thought subject to the commercial activity exception, not by Congress and not by the courts. *See* S. REP. NO. 102-342, at 47 (1992); *Lawton v. Republic of Iraq*, 581 F. Supp. 2d 43, 45 (D.D.C. 2008).

Plaintiffs also rely on *Doe v. Bin Laden*, 663 F.3d 64 (2011) (Resp. Br. 53-54), but here, too, they have misconstrued the issue. Unlike in *Doe*, Sberbank's position is not that JASTA impliedly repealed the commercial activity exception; Sberbank's position is that the commercial activity exception *never applied under the ATA in the first place*. (Sberbank Br. 35-39).

By contrast, prior to *Doe*, circuit courts had held that the so-called non-commercial tort exception could pierce immunity for claims arising from terror attacks (though *not* claims under the ATA—no case has ever held that). *Doe*, 663 F.3d at 68-69. Consequently, when defendants in *Doe* argued that the then newly enacted state-sponsored terror exception displaced the non-commercial tort

exception, *Doe* recognized that they were in fact arguing that Congress had implicitly repealed that exception. *Id*. at 69. *Doe* therefore applied the presumption against implied repeals, concluding that Congress did not intend to replace the non-commercial tort exception with the state-sponsored terror exception. *Id*.

*Doe*, therefore, does not apply here because Sberbank does not argue that JASTA impliedly repealed the existing FSIA exceptions; ATA immunity was never subject to those exceptions in the first place.

### B. Even if the FSIA's Commercial Activity Exception Could Pierce Sovereign Immunity Under the ATA, the Exception Does Not Apply

Plaintiffs concede that they do not invoke the third prong of the commercial activity exception, 28 U.S.C. § 1605(a)(2), which would require them to demonstrate a "direct effect in the United States." (Resp. Br. 42). That concession moots Section IV.E.3 of Sberbank's opening brief, but requires Plaintiffs to establish either the first prong of the exception (that their claims are "based upon . . . commercial activity *in the United States*") or second prong (that their claims are "based upon . . . an act performed *in the United States* in connection with a commercial activity of the foreign state elsewhere.") 28 U.S.C. § 1605(a)(2) (emphasis added).

The phrase "based upon" modifies all three prongs of the exception, and requires the courts to "zero[] in on" the "core" conduct that "actually injured" the Plaintiffs. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015). This Court,

moreover, has explained that the phrase "'based upon' requires a degree of closeness between the acts giving rise to the cause of action and those needed to establish jurisdiction that is considerably greater than common law causation requirements." *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 390 (2d Cir. 2000) (citation omitted).

For the reasons set forth in Section IV.D of Sberbank's opening brief, Plaintiffs' claims here are ultimately "based upon" the attack on MH-17 itself and indeed *cannot* be "based upon" the two funds transfers through Sberbank's correspondent accounts. (Sberbank Br. 53-56).

Plaintiffs respond that the Court should instead limit its inquiry to the "act of international terrorism" that they allege against Sberbank under the ATA. (Response Br. 45). That approach cannot work because it applies the very "one-element test" that the Ninth Circuit employed and that the Supreme Court rejected in *Sachs*, 577 U.S. at 34. By arguing that one element of the ATA—the alleged "act of international terrorism"—consists of commercial activity, Plaintiffs ignore the "core" of the suit. *Id.* at 35.

Yet even if the Court were to accept Plaintiffs invitation to focus on the "act of international terrorism," Plaintiffs still fail to establish the commercial activity exception because they do not allege an "act of international terrorism" in the United States.

Plaintiffs rely on the D.C. Circuit's decision *Rodriguez v. Pan American Health Organization*, 29 F.4th 706 (D.C. Cir. 2022), which is indeed "instructive," (Resp. Br. 44), but not in the manner they suppose. In *Rodriguez*, defendant Pan-American Health Organization ("PAHO") participated—deliberately, by contract—in Cuba's Mais Médicos program, which trafficked Cuban doctors to Brazil, in exchange for payment to a bank account *in the United States*. *Id*. at 709-10. That payment in and of itself violated 18 U.S.C. § 1589(b), which criminalizes receiving a financial benefit from human trafficking, and therefore established plaintiffs' causes of action under the Torture Victims Protection Act: "the 'financial benefit' that violate[d] 18 U.S.C. § 1589(b) is itself 'wrongful conduct' and occurred in the United States, to wit: PAHO received, forwarded and retained the Mais Médicos money through its Washington, D.C. bank account." *Id*. at 716.

That is not the case here, because the only alleged commercial activity alleged to have been undertaken by Sberbank *in the United States* is its operation of correspondent accounts in New York, through which funds allegedly flowed to the accounts of DPR supporters *in Russia and Ukraine*. (*See, e.g.*, A. 150-154). Although correspondent accounts are now a commonly alleged basis for specific jurisdiction in ATA cases, they are nothing more than "a domestic bank account held by a foreign bank"—that is, funds in the correspondent accounts are held by Sberbank itself, not the various alleged DPR supporters referenced in the Second

Amended Complaint. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165 n. 3, 174 (2d Cir. 2013). Such accounts "facilitate the flow of money worldwide, often for transactions that otherwise *have no other connection to New York, or indeed the United States*." *Id*. at 165 n. 3 (emphasis added).

Plaintiffs cite no case holding that the use of a correspondent account *by itself* establishes an ATA claim. Rather, in ATA cases, the "allegedly culpable conduct *stems from*" the use of such accounts. *Id*. at 166 (emphasis added); *see also Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 341 (2012) ("[T]he specific harms suffered by plaintiffs flowed not from [defendant's] alleged support of a terrorist organization, but rather from rockets.")

That is so because "international terrorism" consists of acts that are: (i) "violent" or "dangerous to human life"; that (ii) "violat[e]" a state or federal "criminal law"; and that (iii) "appear" to be intended to "intimidate" civilians or "influence the policy of a government by intimidation or coercion." 18 U.S.C. § 2331; *see generally Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 160 (2d Cir. 2021). None of these elements can be established unless and until the funds are delivered to the alleged terrorists with defendant's knowledge.

First, it is not the mere delivery of funds into and out of Sberbank's accounts in New York that constitutes an act "dangerous to human life," it is the alleged knowing or highly reckless transmission of those funds to the DPR. *See Boim v.*

*Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) ("Giving money to Hamas, like giving a loaded gun to a child . . . is an 'act dangerous to human life.'") Until those funds were allegedly credited to the accounts of its supporters overseas, there was no dangerous act.

Second, the mere delivery of funds into Sberbank's hands in New York cannot violate Section 2339A, which "makes it a federal crime to 'provide[] material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of various terrorism-related criminal statutes." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 41 (D.D.C. 2010). Nor can it violate Section 2339C, which makes it a crime to "provide[]" or "collect[]" funds knowing that they will be used to carry out terror attacks. To establish that mens rea, Plainitiffs rely on the theory that Sberbank failed in its duty to "to investigate, monitor, and review transactions." (Pls.' Mem. Law Opp'n Mot. Dismiss 54, ECF No. 172). That failure—if indeed there were any such failure—cannot have occurred in the United States, only in Russia.

Third, even the violation of the underlying criminal predicate "does not invariably equate to an act of international terrorism" unless it is also "intended to intimidate or coerce civilians or to influence or affect governments." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 326-27 (2d Cir. 2018). Again, the mere transfer of funds

into and out of Sberbank's correspondent accounts cannot establish this element, only (perhaps) the completed transfers to the DPR's accounts in Russia and Ukraine.

Fourth, there is no violation of the ATA unless a "national of the United States" is injured "by reason of" the act of international terrorism. 18 U.S.C. § 2333. The mere transfer of funds into Sberbank's New York correspondent accounts injured no one, American or otherwise—only the attack on MH-17 caused such injury, a conclusion that brings the analysis full circle to *Sachs*, properly construed.

Unlike in *Rodriguez*, where the defendant's alleged crime accrued the moment it received the completed funds transfers at its own bank account in the United States, here the alleged predicate crimes and ATA cause of action cannot have accrued until these alleged DPR supporters received their funds in their overseas accounts with Sberbank's alleged knowledge. Even focusing on the "act of international terrorism," Plaintiffs' claims are based on alleged overseas activity.

## C. Further Jurisdictional Discovery is Improper in the Absence of a Cross-Appeal

In response to Sberbank's argument that Plaintiffs' ATA claims cannot possibly be "based upon" U.S.-based correspondent account transfers because Plaintiffs have only shown two such transfers amounting to $300 (Sberbank Br. 55), Plaintiffs assert that they are not obligated to produce evidence at this stage. (Resp. Br. 47). But that is not true, because "[o]nce the defendant presents a prima facie case that it is a foreign sovereign [or an instrumentality of a foreign sovereign], the

plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 114 (2d Cir. 2013) (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir.1993)) (alterations in original).

Plaintiffs therefore ask for jurisdictional discovery "in the alternative." (Resp. Br. 49-50). That request is wholly improper, however, because it "seek[s] affirmative relief that requires a cross-appeal," which Plaintiffs did not bring. *In re Johns-Manville Corp.*, 476 F.3d 118, 124 (2d Cir. 2007); *see also Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1286 (2d Cir. 1994) ("Although an appellee who has not cross-appealed may urge alternative grounds for affirmance, it may not seek to enlarge its rights . . . .")

Plaintiffs are therefore precluded from seeking a remand with instructions to authorize additional jurisdictional discovery.

## IV. SBERBANK DID NOT WAIVE OR FORFEIT ITS SOVEREIGN IMMUNITY NOR ANY ARGUMENT IN SUPPORT OF IT

Occasionally in their response brief Plaintiffs grumble that Sberbank waived its sovereign immunity, or waived some of its particular arguments in support of its sovereign immunity. Plaintiffs, however, offer little analysis in support of that conclusion—because it is incorrect.

"[F]orfeiture is the failure to make a timely assertion of a right[;] waiver is the 'intentional relinquishment or abandonment of a known right.' " *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal citations omitted). To establish waiver, defendants must show that plaintiffs "relinquished a right with both knowledge of the existence of the right and an intent to relinquish it." *Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d Cir. 1983) (citations omitted). "[T]he filing of a responsive pleading," moreover, "is the last chance to assert FSIA immunity"—and that is exactly what Sberbank did. *Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*, 12 F.3d 317, 326 (2d Cir. 1993); (A. 173).

Plaintiffs nevertheless point to three footnotes in Sberbank's district court briefing in which they claim Sberbank disclaimed the defense of sovereign immunity. But a footnote is hardly the place in which to find clear "intent to relinquish" a right. *Voest-Alpine*, 707 F.2d at 685. These footnotes, moreover, respond to Plaintiffs' inflammatory allegation that Sberbank was an "instrumentality" of the Russian Government, in the sense that Sberbank acted at its direction. (*See* A-157 ¶ 364) ("Sberbank . . . provided banking and money transfer services to the DPR, including its fundraisers, and its affiliates as a matter of official policy, consistent with the policy of the Government of the Russian Federation . . . .") That is false, which is why Sberbank rejected the allegation in these footnotes.

Plaintiffs also insinuate that Sberbank's bringing of "three motions" should be held against it. But the first of these two motions led Plaintiffs to retreat by amending their complaint (ECF Nos. 104, 156), which can hardly be held against Sberbank, and the district court then permitted Sberbank to bring its third motion consistent with *Drexel-Burnham* and the obligation of all federal courts to ensure their subject-matter jurisdiction. Plaintiffs' insistence, moreover, that Sberbank should have preemptively raised its immunity under the ownership of the Central Bank improperly places upon Sberbank the obligation to anticipate and refute in advance Plaintiffs' own improper reliance on *Dole*.

Sberbank no more waived its presumptive immunity than Plaintiffs *conceded* it when they wrote, in their Second Amended Complaint, that "the Government of the Russian Federation, [] owns 51% of the bank" (A. 76); or that "[a]t all relevant times, Defendants Sberbank and VTB Bank were owned by the Government of the Russian Federation" (A. 157); or that "Defendant Sberbank is a Russian state-owned banking institution." (A. 75).

The district court expressly declined to reach Plaintiffs' arguments for waiver and neither should this Court.

**CONCLUSION**

The district court erroneously denied Sberbank's motion to dismiss under the ATA and FSIA. This Court should reverse and remand with instructions to dismiss this action as against Sberbank with prejudice.

Dated:      July 11, 2023
            New York, New York

                                 Respectfully submitted,

                                 WILK AUSLANDER LLP

                                 By:   /s/ Jay Auslander
                                     Jay S. Auslander
                                     Natalie Shkolnik
                                     Michael Van Riper
                               825 Eighth Avenue, Suite 2900
                               New York, New York 10019
                               (212) 981-2300

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing reply brief complies with the length limitations of Local Rule 32.1 because it is 6,949 words. It complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) because it is printed in 14-point Times New Roman font, which is a proportionally spaced font with serifs.

*/s/ Jay S. Auslander*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 11, 2023, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.

*/s/ Jay S. Auslander*